746 P.2d 497

TRANSAMERICA FINANCIAL CORPO-
RATION, a Delaware corporation; Pa-
cific Finance Loans, a California cor-
poration; Transamerica Financial Ser-
vices, Inc., an Arizona corporation, Pe-
titioners,

v.

SUPERIOR COURT of the State of Arizo-
na, IN AND FOR the COUNTY OF
MARICOPA, and the Honorable Frank
T. Galati, a Judge thereof, Respondent
Judge,

and

Olivia M. RASCON; Jorge G. and Anto-
nia G. Medina, husband and wife, indi-
vidually and on behalf of all others
similarly situated, Real Parties in In-
terest.

No. 1 CA–SA 018.

Court of Appeals of Arizona,
Division 1, Department D.

July 9, 1987.

Review Granted Jan. 5, 1988.

Streich, Lang, Weeks & Cardon by
James K. LeValley, William S. Hawgood II,
Charles W. Jirauch, and Randall S. Theisen,
Phoenix, for petitioners.

Southern Arizona Legal Aid, Inc. by Wil-
liam E. Morris and Charles R. Pyle, Tuc-
son, and Community Legal Services by No-
reen Sharp and John R. Dacey, Phoenix,
and Armand Salese, Tucson, and Meyer,
Hendricks, Victor, Osborn & Maledon, P.A.
by William Maledon and Colin Campbell,
Phoenix, for real parties in interest.

Robert K. Corbin, Atty. Gen. by Patrick M. Murphy, Chief Counsel, Financial Fraud Div. and W. Mark Sendrow, Asst. Chief Counsel, Phoenix, *amicus curiae* counsel.

## OPINION

HAIRE, Judge.

This special action presents an issue of first impression concerning the existence of a private right of action under the Arizona Consumer Loan Act, A.R.S. § 6–601 *et. seq.* It is a class action suit that involves an estimated 2600 class members. In addition, there are at least four other actions pending in the Arizona state and federal courts involving this same issue.[1] Each of the class action suits involves hundreds of class members and seeks millions of dollars in relief, and each involves the basic legal issue presented in this special action. Accordingly, we find that this special action raises an important issue of statewide concern, and accept jurisdiction of this matter pursuant to A.R.S. § 12–120.21(A)(3). *See United States v. Superior Court*, 144 Ariz. 265, 269, 697 P.2d 658, 662 (1985).

## I. HISTORICAL BACKGROUND

The basic issue involved in this special action is more easily understood when discussed in context with the history of usury and the circumstances that led to the passage of the Consumer Loan Act.

### (a) Usury in Arizona

Throughout history, usury has been denounced.[2] While it was still a territory, Arizona set its maximum interest rate at 12% per annum. When Arizona became a state, it dropped the ceiling to 10%. Since that time, the maximum interest rate available has varied although the state consistently has prohibited usury. Special Project, *Usury and the Monetary Control Act of 1980*, 1981 Ariz.St.L.J. 27, 122–27 (hereinafter cited as "Special Project"). The Consumer Loan Act is part of the legislative effort to remedy the problem of usury. The Act sets a ceiling on the interest rates of relatively small "consumer" loans.

In the late 1970s, prime interest rates shot above the maximum amount allowed by the Arizona usury statutes.[3] This increase caused significant problems for the state. Local financial institutions can provide only a fraction of the funds required to fund economic growth in the state. Consequently, Arizona must import money from other capital markets. While Arizona's ceiling on interest rates remained at 12% in the late 1970s, several neighboring growth states provided lenders more lenient regulation of interest rates. Special Project, 1981 Ariz.St.L.J. at 111. Unless lenders could obtain a return of capital that at least equaled the prevailing market rate, Arizona's external sources of capital would "dry up". *See Altherr v. Wilshire Mortgage Corp.*, 104 Ariz. 59, 61, 448 P.2d 859, 861 (1968). The possibility of losing the supply of money posed a serious threat to the stability of Arizona's economy.

In response to this financial crisis, in 1980 the legislature revamped the state's usury law by providing a flexible monetary policy that is adaptable to fluctuating money markets. Special Project, 1981 Ariz.St. L.J. at 112. Since April 1980, the general usury law, A.R.S. § 44–1201(A), has allowed the parties to a loan to agree in writing to any rate of interest.

### (b) The Consumer Loan Act

Arizona and other states have historically recognized a need for certain exceptions to their general usury statutes, including an exception allowing lenders to charge

---

1. Two cases have been filed in Maricopa County Superior Court: *Allread v. Household Finance Corp.*, No. C–543316, and *Aros v. Beneficial Arizona, Inc.*, No. C–578634. Two cases have been filed in the United States District Court: *Rosner v. Household Finance Corp.*, No. CIV 85–68 TUC–RMB, and *Samorano v. Aetna Finance Co.*, No. CIV 84–196 TUC–WDB.

2. For a thorough discussion of the history of usury, *see* Special Project, *Usury and the Monetary Control Act of 1980*, 1981 Ariz.St.L.J. 27, 61–110.

3. Although the prime interest rate exceeded 15.5% in late 1979, Arizona's general usury limitation was fixed at 12%. Special Project, 1981 Ariz.St.L.J. at 111.

higher interest rates for small "consumer" loans. The need for this exception arose with the appearance of "loan sharks" shortly after the Civil War. R. Nugent, *The Loan-Shark Problem,* 8 Law & Contemp.Probs. 3, 5 (1941).

Legitimate lenders could not profitably make the loans the wage earners needed because small loans cost as much to process as larger loans, and usury laws fixed interest rates at an amount too low for lenders to meet these costs and make a profitable return. F. Hubachek, *The Development of Regulatory Small Loan Laws,* 8 Law & Contemp.Probs. 108, 109 (1941). In addition, legitimate lenders were reluctant to make the loans because the wage earners had no collateral to offer other than the prospect of future wages. With no legitimate source of relief to their financial problems, the wage earners often turned to "the money bootlegger, whose extortionate charges and harsh collection methods earned the term 'loan shark.' " F. Hubachek, *Progress and Problems in Regulation of Consumer Credit,* 19 Law & Contemp.Probs. 4, 5 (1954).

Around the turn of the century, many communities had recognized the need to deal with the "anti-social characteristics of the loan-shark business." Nugent, 8 Law & Contemp.Probs. at 6. Studies of the problem resulted in a realization that lenders must be allowed to charge a commercially profitable interest rate controlled by a regulatory scheme requiring rigid adherence to standards of conduct prohibiting fraud and oppression. Hubachek, 8 Law & Contemp.Probs. at 111–12.

In 1916, the Russell Sage Foundation ("Foundation") made the first attempt to formulate a national policy on the problem when it drafted the Uniform Small Loan Law. *Id.* at 111–13. The law allowed lenders to make small loans with interest rates higher than those allowed by the usury statutes. In turn, the lenders were subject to strict regulation by an administrative agency.

Using the uniform law as a pattern, Arizona passed the Small Loan Act in 1919.[4] The Act allowed interest of 3 ½% per month on small loans of up to $300 based on the premise that the loans would be repaid in a short term. Special Project, 1981 Ariz.St.L.J. at 128. The state auditor administered the Act until 1939. At that time, the Small Loan Act became part of the Banks and Financial Institutions Code, and the superintendent of banks was made responsible for the enforcement and administration of the Act.

In 1956, the legislature enacted a major revision of the Small Loan Act. The new provisions were patterned very closely after the seventh draft of the Uniform Small Loan Law promulgated by the Foundation. Among its many changes, the new Act increased the maximum limit for small loans to $600. It also established a two-tiered interest rate of 3% per month on unpaid balances below $300 and 2% per month on unpaid balances between $300 and $600. Special Project, 1981 Ariz.State L.J. at 128. In 1971, the legislature increased the loan ceiling to $2500 with a tiered system of interest rates. *Id.* at 131.

In 1980, the Small Loan Act was renamed as the Consumer Loan Act, and the maximum loan amount rose to $10,000. While the legislature enacted many changes in the Act, the policies behind the legislation remained the same. The Act requires lenders to be licensed and to submit to certain regulation by the superintendent of banks. The Act also specifies the rate which licensed lenders may charge on loans falling within the present "small loan" category.

---

**4.** Other states also readily embraced the Uniform Small Loan Act. By 1923, twenty states had adopted a regulatory scheme based on its principles. As states enacted effective laws regulating small loans, loan sharks began to disappear. As of 1980, all states except Arkansas had enacted a special scheme for small loans. Special Project, 1981 Ariz.St.L.J. at 93. Although the laws are based on the principles of the drafts of the uniform law, their coverage varies extensively because the drafts "are only models intended to be rewritten for each state in conformity with local laws, decisions, public policy, and social conditions." Hubachek, 8 Law & Contemp.Probs. at 123. For examples of some of the changes made because of state policy, *see* B. Curran, *Trends in Consumer Credit Legislation* 16–45 (1966).

When the legislature removed the ceiling on interest rates under the general usury statute in 1980, it effectively deregulated the small loan industry even though it did not expressly remove the ceiling on interest rates under the Consumer Loan Act. Under A.R.S. § 6–602(A), a lender must be licensed under the Consumer Loan Act *only* if it charges interest rates that exceed those allowed by the general usury law. Because the general usury law now permits lenders to charge whatever the borrower agrees to in writing, an unlicensed lender is not required to limit itself to the rates allowed by the Act.[5]

Before 1980, lenders had an incentive to be licensed under the Consumer Loan Act because the Act allowed them to charge higher interest rates than were permitted under the general usury statute. When the legislature removed the ceiling under the general usury statute, lenders lost the incentive to submit to the regulation of the Consumer Loan Act.[6] The changes in the general usury law allowed unlicensed lenders to lawfully make small loans with interest rates higher than those permitted by the Consumer Loan Act.

In 1984, the legislature again amended several provisions of the Consumer Loan Act. The amendments did not change the policies of the Act, but did change some of its procedures, as well as the consequences resulting from a violation of the interest limitations imposed by the Act. As is discussed below, this lawsuit only involves the validity of certain loans made between 1980 and 1984.

## II. FACTS

With an understanding of the historical background of the Consumer Loan Act, we now turn to a discussion of the facts of this case.

Transamerica Financial Services, Inc., ("Transamerica Financial") is a licensed lender under the Consumer Loan Act; Pacific Finance Loans ("Pacific Finance") is not licensed under the Act. Transamerica Financial Corporation ("Transamerica Corp.") is the parent of Pacific Finance and Transamerica Financial. For convenience, we will refer to the corporations collectively as Transamerica, unless the context indicates otherwise.

Between 1980 and 1984, the members of the class (hereinafter collectively referred to as "Rascon") borrowed money from Pacific Finance, an unlicensed lender, at interest rates that exceeded those allowed by the Consumer Loan Act. The loans, which ranged from $2500 to $10,000, were secured by deeds of trust on real property. Pacific Finance made approximately 2600 of these loans during the four years.

As an unlicensed lender, Pacific Finance could lawfully charge whatever interest rate the borrowers agreed to in writing. Rascon's complaint alleges, however, that the loans made by Pacific Finance should be attributed to Transamerica Financial based on an alter ego theory.[7] Rascon alleges that Transamerica Financial and Pacific Finance are merely two faces for what is essentially the same subsidiary of Transamerica Corp. Consequently, she argues, the loans made by the unlicensed lender (Pacific Finance) should be treated as though they were made by the licensed lender (Transamerica Financial). She then argues that the loans made by Pacific Finance violated the Consumer Loan Act,[8]

---

5. In this special action, we have assumed, without deciding, that a *licensed* lender remains subject to the interest limitations set forth in the Consumer Loan Act.

6. Indeed, lenders now may have a strong incentive to not be licensed under the Consumer Loan Act when the prevailing interest rates exceed the maximum rate allowed by the Act. "Why anyone should ever seek a license under the Consumer Loan Act in the future is beyond our power to understand. Presumably, only the uninformed will apply." Special Project, 1981 Ariz.St.L.J. at 156.

7. Neither the factual nor legal validity of this theory is involved in the issues presented in this special action.

8. Rascon's theory is that the 1980 amendments to the Consumer Loan Act only deregulated small loans by *unlicensed* lenders, and that *licensed* lenders remained subject to the interest restrictions imposed by the Act. The validity of this theory has not been raised as part of this special action.

and, consequently, they were void *ab initio* pursuant to A.R.S. § 6–628.[9]

Rascon argues that § 6–628 prohibits Pacific Finance from collecting any unpaid interest, principal, or other charges on its loans. She further argues that the statute requires Pacific Finance to reimburse her for all interest, principal, and other charges it has already collected. Transamerica estimates that this interpretation of the statute would require Pacific Finance to refund or to refrain from collecting approximately $30,000,000.

Transamerica counters by arguing that the relationship between Pacific Finance and Transamerica Financial does not violate the Consumer Loan Act, but instead is expressly permitted by the Act. According to Transamerica, this relationship—also known as a "dual lending operation"—is common in the consumer finance industry throughout the United States. Transamerica argues that A.R.S. § 6–613[10] specifically allows dual lending operations unless the superintendent of banks holds a hearing and determines that the dual lending operations are being used in an attempt to conceal an evasion of the Consumer Loan Act.

Transamerica argues that it did not attempt to evade the Consumer Loan Act by using the dual lending operations. Instead, it openly conducted the dual operations and annually disclosed the arrangement in its reports to the superintendent of banks.

The superintendent never held a hearing or determined that Transamerica's dual operations constituted an evasion of the Act. In addition, Transamerica argues that Rascon cannot articulate exactly how it evaded the Consumer Loan Act: Rascon has not alleged fraud or material misrepresentation by Transamerica. Transamerica claims that Rascon is attempting to deprive the superintendent of her power to regulate dual lending operations pursuant to A.R.S. § 6–613.

Shortly after the trial court certified this case for class status, Transamerica filed a motion to dismiss on two grounds: (1) the Consumer Loan Act does not expressly or impliedly provide a private action; and (2) Rascon did not exhaust her administrative remedies. The trial court denied the motion to dismiss, holding that there is an implied private right of action under the Consumer Loan Act pursuant to *Sellinger v. Freeway Mobile Home Sales, Inc.*, 110 Ariz. 573, 521 P.2d 1119 (1974). The court also denied the motion to dismiss for failure to exhaust administrative remedies.

Transamerica then challenged the trial court's ruling by filing this special action. We grant the relief sought and hold that no implied private right of action arises under the Consumer Loan Act.

### III. IMPLIED PRIVATE RIGHTS OF ACTION

The parties agree that the Consumer Loan Act does not provide an express pri-

9. A.R.S. § 6–628 (Supp.1980–81) provided the following remedies when a licensed lender violated the Consumer Loan Act:

"In addition to the charges provided in this article no further or other amount whatever shall be directly or indirectly charged, contracted for, or received by the licensee but such restrictions shall not apply to court costs, reasonable attorneys' fees assessed and fixed by the court, lawful fees for the acknowledging, filing and recording or releasing in any public office of any instrument securing a loan, or insurance premiums as provided in § 6–632. If any amount in excess of the charges permitted by this article is charged, contracted for or received, except as the result of an accidental or bona fide error, the contract of loan shall be void and the licensee shall have no right to collect or receive any principal, charges, or recompense whatever."

10. A.R.S. § 6–613 reads as follows:

"A. Not more than one place of business shall be maintained under the same license, and not more than one license shall be maintained in a place of business, but the superintendent may issue additional licenses to the same licensee upon compliance with the provisions of this article governing issuance of a single license.

"B. No licensee shall conduct the business of making loans under this article within any office, suite, room or place of business in which any other business is solicited or engaged in, or in association or conjunction with any other business, if the superintendent finds, after a hearing, that the other business is of such a nature as to conceal an evasion of this article, and issues a written order accompanied by findings of fact directing the licensee to desist."

vate right of action. Consequently, if we are to find a private right of action we must imply it from the provisions of the Act. Initially, we reject Rascon's argument that judicial decisions from other states compel us to hold that the Consumer Loan Act implies a private right of action. Rascon cites a number of cases in support of this proposition, but none of them is persuasive.

Although the Consumer Loan Act and its equivalent in other states are based on drafts of the Uniform Small Loan Law, they are far from "uniform." The uniform law is merely model legislation, and the states have made significant changes in it to conform to their particular policy considerations. *See supra* note 4. One of the most common changes is the addition of express statutory language allowing a private right of action. *See, e.g.,* Ala.Code § 5–18–15[h] (1975); Ga.Code Ann. § 7–3–29 (1982); Miss.Code Ann. § 75–67–111 (1972); Neb.Rev.Stat. § 45–137(4) (1984); N.J.Rev.Stat. § 17:10–14 (1984); S.D. Codified Laws § 54–6–40 (1980); Va.Code §§ 6.1–252, 6.1–278 (1983); W.Va.Code § 46A–5–101(2) (1986). In all, twenty states specifically allow borrowers to recover monies paid to lenders in violation of their version of the Small Loan Act. Arizona has not done so.

In addition, other states have added statutory provisions that imply the existence of a private right of action. Perhaps the most common of these is a bonding requirement. These statutes typically allow "any person" to recover against the bond for any "cause of action" he might have against a lender who violates the Small Loan Act. *See, e.g.,* Ky.Rev.Stat.Ann. § 288.050(3) (1953); N.H. Rev.Stat.Ann. § 399–A:16 (1983); R.I.Gen. Laws § 19–25–3 (1982). Although earlier versions of the Consumer Loan Act required a bond, Arizona presently has no bonding provision.

Every case cited by Rascon arose in a jurisdiction that specifically allows a private right of action for violations of the Act. Two of the cases involved statutory schemes that allowed an injured party to bring an action on the bond required of the lender. *In re Harrington,* 6 B.R. 655 (Bankr.R.I.1980); *Hardman v. New Finance Co.,* 259 S.W.2d 431 (Ky.Ct.App. 1953). In another, the court allowed a private action based on a statute of limitations that referred to "any suit brought ... by any person." *Bailey v. Defenbaugh & Co. of Cleveland, Inc.,* 513 F.Supp. 232 (N.D. Miss.1981). The court logically held that this provision did not make sense if the legislature had not intended a private remedy under the statute. *Id.* at 240. The last case involved a statutory scheme that specifically allows borrowers to file an action to compel the lender to refund interest and charges collected unlawfully. *Robb v. Central Credit Corp.,* 169 Neb. 505, 100 N.W.2d 57 (1959).

In addition to the above cases, our own extensive research has not uncovered any jurisdiction allowing a private right of action without a specific statutory authorization. We therefore turn to our own Act in order to determine whether its provisions indicate a legislative intent to allow its enforcement by a private action. The federal and state standards involving the determination of the existence of a private right of action are substantially the same; we will, however, discuss them separately.

### (a) Federal Case Law

The landmark federal case on the implication of a private right of action is *Cort v. Ash,* 422 U.S. 66, 95 S.Ct. 2080, 45 L.Ed.2d 26 (1975). *Cort* established a four-pronged test to determine whether a private right of action exists: (1) whether the plaintiff is a member of a class for whose especial benefit the statute was enacted; (2) whether the legislative intent explicitly or implicitly creates or denies a remedy; (3) whether a private remedy is consistent with the underlying purposes of the legislative scheme; and (4) whether it would be inappropriate to infer a right of action based solely on federal law because the right of action is one traditionally relegated to state law. *Cort,* 422 U.S. at 78, 95 S.Ct. at 2088, 45 L.Ed.2d at 36.

Since its decision in *Cort,* however, the Supreme Court has tempered its liberal at-

titude toward implying a private right of action and instead has adopted a more restricted approach. *See Touche Ross & Co. v. Redington,* 442 U.S. 560, 578, 99 S.Ct. 2479, 2490, 61 L.Ed.2d 82, 97 (1979). Although the Supreme Court still relies on the four factors discussed in *Cort,* it notes that *Cort* did not determine "that each of these factors is entitled to equal weight. The central inquiry remains whether Congress intended to create, either expressly or by implication, a private cause of action." *Id.,* 442 U.S. at 575, 99 S.Ct. at 2489, 61 L.Ed.2d at 96. *See also Middlesex County Sewerage Authority v. National Sea Clammers Assoc.,* 453 U.S. 1, 13, 101 S.Ct. 2615, 2622, 69 L.Ed.2d 435, 446 (1981); *Universities Research Assoc., Inc. v. Coutu,* 450 U.S. 754, 770, 101 S.Ct. 1451, 1461, 67 L.Ed.2d 662, 675 (1981).

The federal courts no longer will imply a private right of action merely because a private right of action might help achieve the remedial purposes of a statutory scheme. *E.g., LeVick v. Skaggs Companies, Inc.,* 701 F.2d 777, 778–79 (9th Cir. 1983). Still, the first three factors listed in *Cort* are useful in determining legislative intent. *Redington,* 442 U.S. at 575–76, 99 S.Ct. at 2489, 61 L.Ed.2d at 96.

In determining whether Congress intended to create a private remedy, the Supreme Court has held that "the failure of Congress expressly to consider a private remedy is not inevitably inconsistent with an intent on its part to make such a remedy available." *Transamerica Mortgage Advisors, Inc. v. Lewis,* 444 U.S. 11, 18, 100 S.Ct. 242, 246, 62 L.Ed.2d 146, 154 (1979). The intent to make the remedy available may appear "implicitly in the language or structure of the statute, or in the circumstances of its enactment." *Id.* However,

the court will not automatically find a private right of action merely because "a federal statute has been violated and some person harmed." *Cannon v. University of Chicago,* 441 U.S. 677, 688, 99 S.Ct. 1946, 1953, 60 L.Ed.2d 560, 570 (1979).

### (b) Arizona Case Law

Three major cases address Arizona law on implying a private right of action. The landmark case was decided before *Cort. Sellinger v. Freeway Mobile Home Sales, Inc.,* 110 Ariz. 573, 521 P.2d 1119 (1974). In *Sellinger,* the Arizona Supreme Court found a private right of action under the Arizona Consumer Fraud Act, based on the cumulative remedies provision of the Act.[11] The court cited the need to look to the intent of the legislature, which intent is based on "the context of the statute, the language used, the subject matter, the effects and consequences, and the spirit and purpose of the law." *Id.,* 110 Ariz. at 575, 521 P.2d at 1121.

The court found support for its decision in pre-*Cort* decisions of the United States Supreme Court that provided for "civil actions by private persons based on the violation of penal statutes." *Id.,* 110 Ariz. at 576, 521 P.2d at 1122. Under the Arizona Consumer Fraud Act, it was a misdemeanor to "wilfully and intentionally" violate any provision of the Consumer Fraud Act. *Id.,* 110 Ariz. at 575–76, 521 P.2d at 1121–22.

The Arizona Supreme Court has also found that the Arizona Insurance Code allows a private right of action. *Sparks v. Republic National Life Insurance Co.,* 132 Ariz. 529, 540, 647 P.2d 1127, 1138 (1982). Once again, the court based its finding on a cumulative remedies provi-

---

11. The court reasoned as follows:
"Although the Act does not specifically provide for a right of action against persons violating the provisions of the article, we believe inferentially such right of action is granted by § 44–1533. It provides:
" 'The provisions of this article shall not bar any claim against any person who has acquired any monies or property, real or personal, by means of any practice declared to be unlawful by the provisions of this article.'

"Clearly the section quoted contemplates that a person who has been damaged by the practices declared to be unlawful may exert a claim by reason of such acts. It has been held that similar language in a consumer fraud act is sufficient recognition that a cause of action has been created in favor of the consumer. *Rice v. Snarlin, Inc.,* 131 Ill. App.2d 434, 266 N.E.2d 183 (1970)." *Sellinger,* 110 Ariz. at 576, 521 P.2d at 1122.

sion.[12] The court held that the cumulative remedies provision indicated that "the legislature intended [a statute prohibiting misrepresentation and false advertising] to serve as a ground for tort recovery." *Id.* The court did not state the basis for its decision other than to note that "[a]s in *Sellinger*, we believe that this section [the cumulative remedies provision] contemplates a private suit to impose civil liability irrespective of governmental action against the insurer." *Id.*, 132 Ariz. at 541, 647 P.2d at 1139.

Most recently, this court refused to imply a private right of action under the Fraudulent Advertising Practices Act. *Ward v. Fireman's Fund Insurance Companies*, 152 Ariz. 211, 731 P.2d 106 (App. 1986).[13] We noted that *Sellinger* found reinforcement for its holding based on "a number of [pre-*Cort*] United States Supreme Court decisions that did not appear to be dependent upon the existence of authorizing statutory language but rather reflected a purely judicial determination that providing a private cause of action is appropriate if it furthered the relevant statute's legislative goals." *Id.*, 152 Ariz. at 216, 731 P.2d at 111. Based on federal decisions after *Cort*, we determined that legislative intent was the key factor in implying a private right of action.

## IV. IMPLYING A PRIVATE RIGHT OF ACTION UNDER THE CONSUMER LOAN ACT

■ After *Ward*, Arizona law and federal law have essentially the same standards

for finding an implied private right of action. The first three prongs under *Cort* serve as indicators of the ultimate determination—legislative intent. The final prong under *Cort* is irrelevant to our analysis because this is a matter of purely state concern.

■ The analysis need not be made point-by-point under the prongs stated in *Cort*, however. The prongs are useful only to the extent that they indicate legislative intent. We will not find a private right of action merely because it would be useful or because we feel it might "improve upon the statutory scheme that [the legislature] enacted into law." *Redington*, 442 U.S. at 578, 99 S.Ct. at 2490, 61 L.Ed.2d at 97. Nor will we imply a private right of action merely because it would aid the "remedial purpose" of the Act. Such an argument involves a policy determination that the legislature must make.

Transamerica argues that the legislature did not intend to imply a private right of action because it did not incorporate a cumulative remedies provision into either the Consumer Loan Act or the Banks and Financial Institutions Code. The Arizona cases do not hold that the legislature may imply a private right of action *only* through a cumulative remedies provision. Rather, they hold that a cumulative remedies provision is one indicator of legislative intent to create a private right of action.

■ After carefully considering all the relevant factors, we conclude that the legis-

---

**12.** The court based its decision on A.R.S. § 20–456(C), which reads as follows:

"C. No order of the director pursuant to this section or order of court to enforce it, or holding of a hearing, may in any manner relieve or absolve any person affected by the order or hearing from any other liability, penalty or forfeiture under law."

**13.** The plaintiffs in *Ward* argued that they had a private right of action under A.R.S. § 44–1481, which reads as follows:

"A. A person is guilty of a class 3 misdemeanor who:

"1. Knowingly and with the intent to sell to the public real or personal property or services, or to induce the public to acquire an interest therein, makes and publishes an advertisement, either printed or by public out-

cry or proclamation, or otherwise, containing any false, fraudulent, deceptive or misleading representations in respect to such property or services, or the manner of its sale or distribution.

"2. Publishes, circulates or disseminates any statement or assertion of fact concerning real estate which is known by him to be untrue, and which is made or disseminated with the intention of misleading.

"B. A merchant is guilty of a class 3 misdemeanor who advertises or displays any brand of goods known to the general public and quotes prices in connection therewith as an inducement to attract purchasers to the place of business so advertised, and makes false statements regarding the quality or merits of the goods advertised."

lature intended that the Consumer Loan Act be enforced through administrative procedures, not by private actions. While none of the factors is determinative by itself, the combination of factors which will be discussed in this opinion, is, in our opinion, conclusive.

### (a) Indicators of Legislative Intent

#### i. Class Benefited by the Consumer Loan Act

The purpose of the Consumer Loan Act is not to exclusively benefit either lenders or borrowers. Instead, the Act has a dual purpose. The legislature passed the Act to remedy the problem of loan sharks preying on necessitous borrowers. To resolve the problem, however, the legislature recognized that legitimate lenders would not make small loans unless they were guaranteed a profitable return. Consequently, the Act was established with a dual purpose: (1) to benefit the borrower of small amounts by eradicating the abuses and unconscionable charges prevalent in the small loan business, and (2) to authorize certain lenders to lawfully charge a borrower an interest rate that exceeds the legal rate.

This dual purpose does not by itself indicate that the legislature intended either to create or deny a private right of action. See Lewis, 444 U.S. at 24, 100 S.Ct. at 249, 62 L.Ed.2d at 157. The question is not merely who will benefit from the Act, but whether the legislature intended to allow a private right of action by the beneficiaries. California v. Sierra Club, 451 U.S. 287, 294, 101 S.Ct. 1775, 1779, 68 L.Ed.2d 101, 107–08 (1981). Accordingly, we look to other indicators of legislative intent.

#### ii. Administrative Scheme

The most persuasive indication of legislative intent is the comprehensive administrative scheme enacted to enforce the Consumer Loan Act. The legislature took the current version of the Act almost in toto from the seventh draft of the Uniform Small Loan Law prepared by the Foundation.[14] The seventh draft includes a statement of legislative intent:

> "It is the intent of the legislature in enacting this law to bring under public supervision those engaged in the business of making such loans, to eliminate practices that facilitate abuse of borrowers, to establish a system of regulation for the purpose of insuring honest and efficient small loan service and of stimulating competitive reductions in charges, to allow lenders who meet the conditions of this Act a rate of charge sufficiently high to permit a business profit, and to provide the administrative machinery necessary for effective enforcement."

Uniform Small Loan Law § 1(a)(7) (Russell Sage Foundation, 7th draft 1942) (emphasis added).

Although the Uniform Law specifically provides administrative remedies, it does not discuss a private right of action.

Even though Arizona did not explicitly adopt the statement of legislative intent, it implicitly did so by enacting the entire administrative scheme contemplated by the Uniform Law. The Consumer Loan Act gives the superintendent of banks the extensive administrative powers and remedies proposed by the Uniform Law. The Act authorizes the superintendent to issue regulations to administer and enforce its provisions. A.R.S. § 6–604.01(A). The superin-

---

**14.** The Consumer Loan Act contains the substance of all of the provisions of the seventh draft of the Uniform Small Loan Law, except for §§ 12(c), 21, 22, and 23. None of these excluded sections contains any material provisions of the seventh draft. Section 12(c) prohibits taking liens on real estate "except such lien as is created by law through the rendition or recording of a judgment." Sections 21–23 are merely the "housekeeping" portions of the seventh draft. Section 21 allows lenders holding licenses before passage of the Act to retain their licenses for six months. Section 22 repeals ear-

lier versions of the Act and states that preexisting obligations are still valid. Section 23 severs any unconstitutional or invalid provisions from the remainder of the Act.

The 1980 revision of the Consumer Loan Act moved two provisions from the Act to the Banks and Financial Institutions Code. The Code now contains the section allowing the superintendent to issue injunctions and cease and desist orders, as well as the section providing for judicial review of a final decision by the superintendent. A.R.S. §§ 6–137, 6–139.

tendent has broad investigative authority under the Act, including the duty to perform an annual examination of each licensee's business. A.R.S. § 6–605.01. In addition, each licensee must file an annual report with the superintendent disclosing detailed information about its business. A.R.S. § 6–617. Finally, the Act gives the superintendent specific administrative authority to regulate dual lending operations. A.R.S. § 6–613(B). Importantly, we note that the foundation of Rascon's claim is the contention that Transamerica's dual lending operations violated the Consumer Loan Act.

Arizona has further strengthened the administrative scheme of the Consumer Loan Act by giving the superintendent additional powers under the Banks and Financial Institutions Code ("Code"). The Code gives the superintendent power to examine and supervise all financial institutions and requires her to conduct annual examinations. A.R.S. §§ 6–121, 6–122. The Code gives the superintendent authority to administer and enforce the laws and regulations relating to financial institutions, in addition to allowing her to make and promulgate the rules and regulations needed to administer the laws. A.R.S. § 6–123. The superintendent may also require any financial institution to produce records and documents, and she may conduct any examinations and investigations she deems appropriate to determine if any person has violated any provision of the Code. A.R.S. §§ 6–123, 6–124.

The superintendent has broad authority to sue and prosecute any action or proceeding required to enforce the Code. This power includes the right to obtain an order "restoring to any person in interest any monies or property, real or personal, which may have been acquired or transferred in violation of this title." A.R.S. § 6–131(A)(3). On request of the superintendent, the attorney general must bring an action to enforce the civil and criminal penalties of the Code. A.R.S. §§ 6–132, 6–136.

Under the Code, the superintendent has broad authority to issue appropriate cease and desist orders when it appears that a person is about to violate any applicable law, regulation, or administrative order. A.R.S. § 6–137(A), (B). The superintendent may also obtain injunctions and any "additional relief as may be available" under the Code. A.R.S. § 6–137(F)(1), (2). The Code also gives the superintendent power to conduct hearings under the Administrative Procedures Act[15] and to issue regulations governing the hearings. A.R.S. § 6–138.

Because the Consumer Loan Act provides express administrative remedies, we are reluctant to imply a private right of action as an additional source of enforcement.

> "[I]t is an elemental canon of statutory construction that where a statute expressly provides a particular remedy or remedies, a court must be chary of reading others into it. 'When a statute limits a thing to be done in a particular mode, it includes the negative of any other mode.'" *Lancaster v. Arizona Board of Regents*, 143 Ariz. 451, 457, 694 P.2d 281, 287 (App.1984), quoting *Lewis*, 444 U.S. at 19–20, 100 S.Ct. at 247, 62 L.Ed. 2d at 154–55.

Our study of the Consumer Loan Act does not reveal a legislative intent to resolve disputes in any manner other than through the administrative remedies it provides. "In the absence of strong indicia of a contrary [legislative] intent, we are compelled to conclude that [the legislature] provided precisely the remedies it considered appropriate." *National Sea Clammers*, 453 U.S. at 15, 101 S.Ct. at 2623, 69 L.Ed.2d at 447. As stated, we find no contrary legislative intent.

Because the legislature provided the comprehensive administrative machinery, we cannot say that it "absentmindedly forgot to mention an intended private action." *Lewis*, 444 U.S. at 20, 100 S.Ct. at 247, 62 L.Ed.2d at 155, quoting *Cannon*, 441 U.S. at 742, 99 S.Ct. at 1981, 60 L.Ed.2d at 603 (Powell, J., dissenting). Stated simply, "[t]he presence in the Act of administrative

---

**15.** A.R.S. § 41–1001 *et seq.*

mechanisms for the resolution of disputes ... betokens the absence of an implied private right." *Oldfield v. Athletic Congress*, 779 F.2d 505, 508 (9th Cir.1985).

### iii. Commentaries

Commentators recognize that the drafters of the Uniform Law intended that it be enforced through administrative rather than judicial procedures.

"The drafters of the uniform act expressly state in the declaration of legislative intent that provision is to be made for 'administrative machinery necessary for effective enforcement' of the act. The entire program of licensing small loan lenders and the supervision of lending activities by an administrative authority, which are established under the act ..., represent the means by which the drafters contemplate that the provisions of the act will be made effective and meaningful." Curran, *Trends in Consumer Credit Legislation* at 42.

The Arizona Legislature adopted the intent of the drafters of the Uniform Law when it enacted the "administrative machinery necessary for effective enforcement" of the Act. "Enforcement was left to the state prosecutor rather than to the zeal of private citizens." Special Project, 1981 Ariz. St.L.J. at 93.

### iv. Private Right of Action Under Usury Statute

Other factors indicate that the legislature did not merely forget to provide a private right of action in the Consumer Loan Act. The legislature expressly provided a private right of action in the general usury statute. A.R.S. §§ 44–1203, 44–1204. The legislature, therefore, showed that when it intended to provide a private remedy for usurious loans "it knew how to do so and did so expressly." *Redington*, 442 U.S. at 572, 99 S.Ct. at 2487, 61 L.Ed.2d at 93. We recognize that "[t]he fact that other provisions of a complex statutory scheme create express remedies has not been accepted as a sufficient reason for refusing to imply an otherwise appropriate remedy under a separate section." *Can-*

*non*, 441 U.S. at 711, 99 S.Ct. at 1965, 60 L.Ed.2d at 584. A private right of action is not an "otherwise appropriate remedy," however, because of the legislative intent to establish the administrative remedy as the exclusive remedy of the Consumer Loan Act.

### v. Adequacy of Remedies

■ Rascon acknowledges that the Act creates administrative remedies, but argues that they are inadequate. We note, however, that she has not attempted to pursue the administrative remedies. She cannot, then, claim that the superintendent will not fulfill her duties mandated by law.

In an *amicus* brief, the superintendent of banks argues that we should allow a private right of action because the superintendent's responsibilities are so broad and her resources so limited that she "cannot possibly take enforcement action on all alleged violations." This argument ignores the legislative determination to enforce the Consumer Loan Act through a comprehensive administrative scheme. The superintendent seeks to have us do judicially what the legislature refused to do.

The federal courts have recognized that the judiciary will not create a private remedy merely because a regulatory agency claims it has insufficient resources to prosecute claims on behalf of private parties.

"Whatever force this argument might once have had is seriously undermined by the [U.S. Supreme] Court's observation ... that 'institutional limitations alone do not lead to the conclusion that any party ... should have a cause of action for damages.' The argument that a regulatory agency is confessedly unable properly to regulate ... as charged by Congress and detailed by its own regulations, and that therefore the federal courts should find a damage remedy implicit in an act which studiously avoided giving one to the class sought to be represented here, is simply unpersuasive." *Riegel Textile Corp. v. Celanese Corp.*, 649 F.2d 894, 905 (2d Cir.1981) (citations omitted), quoting *Piper v. Chris-Craft Industries, Inc.*, 430 U.S. 1,

41, 97 S.Ct. 926, 949, 51 L.Ed.2d 124, 153 (1977).

We find the argument equally unpersuasive.

The administrative remedies establish an adequate procedure for protecting the borrower's rights under the Consumer Loan Act.

### vi. Legislative History

Rascon claims that the legislative history of the Consumer Loan Act reveals legislative intent to allow a private right of action. She asserts that the original Small Loan Act passed in 1919 allowed private actions, and that the Arizona Supreme Court recognized that a private right of action arose under the Small Loan Act when it decided *Walker v. Peoples Finance & Thrift Co.*, 45 Ariz. 226, 42 P.2d 405 (1935). Neither of these assertions is persuasive.

Rascon urges that the 1919 Act allowed a private right of action because § 22 of the 1919 Act provided that a usurious loan could be forfeited "[u]pon *complaint*, or defense, of any borrower of a small loan." (Emphasis added). She argues that by its use of the word "complaint" the legislature intended to allow a private right of action. When § 22 is read in context with the remainder of the 1919 Act, however, the word "complaint" clearly refers to administrative complaints made to the state auditor, who was the licensing official at that time.

Section 12 of the 1919 Act stated that "[t]he licensing official shall notify every licensed money-lender of any charge of violating this act which is being considered ... and shall give at least five (5) days' notice of the time and place fixed for hearing such *complaint*." (Emphasis added). In addition, section 14 required the attorney general to represent the state *"[i]n all complaints of any alleged violation of this act by any licensed money-lender under this section, before the licensing official or upon review of his order or suspension of license before any court."* (Emphasis added). Section 20(a) provided that if a lender refused to comply with a cease and desist order, the licensing official "may proceed upon such *complaint* under section twelve (12) of this act." (Emphasis added).

The only section of the 1919 Act that referred to judicial proceedings described initiation of the process as a "petition." That section discussed the right to judicial review of the administrative findings.

The word "complaint" refers to the same thing in § 22 as it did in the other sections of the 1919 Act—complaints to the administrative agency. *See Knoell Brothers Construction, Inc. v. State Department of Revenue*, 132 Ariz. 169, 171, 644 P.2d 905, 907 (App.1982). The initiation of court proceedings in the 1919 Act is referred to as a "petition."

In similar fashion, our review of *Walker* reveals that the issue was neither raised nor discussed and, accordingly, that the supreme court merely assumed that a private right of action existed.

Even if it were assumed that *Walker* established a private right of action under the 1919 Act, that finding would not be binding unless the legislature intended that the Consumer Loan Act provide a private right of action when it adopted the current scheme in 1956.

"In determining whether a private cause of action is implicit in a federal statutory scheme when the statute by its terms is silent on that issue, the initial focus must be on the state of the law at the time the legislation was enacted. More precisely, we must examine Congress' perception of the law that it was shaping or reshaping. When Congress enacts new legislation, the question is whether Congress intended to create a private remedy as a supplement to the express enforcement provisions of the statute. When Congress acts in a statutory context in which an implied private remedy has already been recognized by the courts, however, the inquiry logically is different. Congress need not have intended to create a new remedy, since one already existed; the question is whether Congress intended to preserve the pre-existing remedy." *Merrill Lynch, Pierce, Fenner & Smith v. Curran*, 456 U.S. 353, 378–79, 102 S.Ct. 1825, 1839, 72 L.Ed.2d 182, 201 (1982).

Our analysis above reveals that when the legislature passed the Consumer Loan Act in 1956, it did not intend to preserve any limited right of action which might have been granted by *Walker*, but instead intended that administrative procedures serve as the only remedy. Not only did the legislature adopt all the administrative remedies of the seventh draft of the Uniform Law, but it also added administrative remedies through the Banks and Financial Institutions Code. The 1919 Act did not contain these extensive administrative remedies.

In addition, we note that earlier versions of the Act required lenders to post a bond that could be reached by "any person who may have a cause of action against the obligor [lender] under this chapter." The 1956 version deleted the bonding requirement, further indicating that the legislature intended that the Act be enforced exclusively through administrative means.

As we have detailed above, the legislature intended to enforce the provisions of the Consumer Loan Act through administrative remedies. Accordingly, we refuse to imply a private right of action.

### (b) Voidness of Loans that Violate the Consumer Loan Act

█ Rascon argues that the legislature implied a private right of action by its use of the word "void" in § 6–628. When a licensed lender charges more than is allowed by the Consumer Loan Act, "the contract of loan shall be void and the licensee shall have no right to collect or receive any principal, charges, or recompense whatever." A.R.S. § 6–628. Rascon argues that the statute gives a borrower the right to have the contract declared void by a court, citing *Transamerica Mortgage Advisors, Inc. v. Lewis*, 444 U.S. 11, 100 S.Ct. 242, 62 L.Ed.2d 146 (1979).

In *Lewis*, the United States Supreme Court implied a limited private right of action under the Investment Advisors Act based on a provision holding that contracts whose formation or performance would violate the Act "shall be void" regarding the rights of "the violator and knowing successors in interest." The court held as follows:

"By declaring certain contracts void, [the statute] by its terms necessarily contemplates that the issue of voidness under its criteria may be litigated somewhere. At the very least Congress must have assumed that [the statute] could be raised defensively in private litigation to preclude the enforcement of an investment advisers contract. But the legal consequences of voidness are typically not so limited. A person with the power to avoid a contract ordinarily may resort to a court to have the contract rescinded and to obtain restitution of consideration paid. And this Court has previously recognized that a comparable provision ... confers a right to rescind a contract void under the criteria of the statute. Moreover, the federal courts in general have viewed such language as implying an equitable cause of action for rescission or similar relief.

"For these reasons we conclude that when Congress declared ... that certain contracts are void, it intended that the customary legal incidents of voidness would follow, including the availability of a suit for rescission or for an injunction against continued operation of the contract, and for restitution." *Lewis*, 444 U.S. at 18–19, 100 S.Ct. at 246–47, 62 L.Ed.2d at 154 (citations omitted).

Rascon's argument emphasizes the word "void" at the expense of the overwhelming legislative intent to the contrary. The word "void" cannot be interpreted by itself, but must instead be evaluated as one piece in the legislative scheme that comprises the Consumer Loan Act. As discussed above, the Act reveals a strong legislative intent that it be enforced through administrative procedures, not judicial remedies. The legislature undoubtedly viewed the word "void" as consistent with this intent.

The analysis in *Lewis* does not require us to ignore legislative intent and imply a private right of action. Indeed, the *Lewis* Court recognized that "what must ultimately be determined is whether Congress intended to create the private remedy asserted." *Lewis*, 444 U.S. at 15–16, 100 S.Ct. at 245, 62 L.Ed.2d at 152. *Lewis* implicitly recognizes that, under certain cir-

cumstances, the voidness of a contract may be determined in a non-judicial forum.

The plaintiffs in *Lewis* argued that they had a private action under §§ 206 and 215 of the Investment Advisers Act of 1940.[16] For the reasons quoted above, the Court implied a limited private right of action under § 215. The Court held that § 206 did not allow an implied private remedy, however. The Court recognized that it must look to legislative intent to determine whether a statute allowed a private right of action. "Such an intent may appear implicitly in the language or structure of the statute, or in the circumstances of its enactment." *Id.*, 444 U.S. at 18, 100 S.Ct. at 246, 62 L.Ed.2d at 154.

The Court allowed a private action under § 215 largely because *the Act did not provide a method for determining the voidness of the contracts. See Dunlap v. Jimmy GMC of Tucson, Inc.*, 136 Ariz. 338, 345, 666 P.2d 83, 90 (App.1983) (Howard, C.J., dissenting). Because Congress provided a remedy (voidness) without a method for determining the applicability of the remedy, the Court logically concluded that "the issue of voidness under [the statute's] criteria may be litigated somewhere." *Lewis*, 444 U.S. at 18, 100 S.Ct. at 246, 62 L.Ed.2d at 154. On the other hand, the Court refused to imply a private remedy under § 206 because "Congress expressly provided both judicial and administrative means for enforcing compliance with § 206." *Id.*, 444 U.S. at 20, 100 S.Ct. at 247, 62 L.Ed.2d at 155. The Consumer Loan Act, like § 206, expressly provides judicial and administrative means of enforcing its provisions. In our opinion the legislature did not intend that the word "void" would override the administrative procedures of the Consumer Loan Act.

Rascon cites a number of cases which supposedly authorize a private right of action based on the statutory use of the word "void". As we have discussed above, all of these cases arose in jurisdictions that have a specific statutory authorization for private actions. In our research, we have found no cases that imply a private right of action based solely on the use of the word "void".[17]

## IV. CONCLUSION

We conclude that no private right of action arises under the Consumer Loan Act. The remedy is, instead, an administrative one, and Rascon must proceed with the administrative remedy before she can bring the matter of Transamerica's alleged "dual lending" violation to the courts. *See Minor v. Cochise County*, 125 Ariz. 170, 172, 608 P.2d 309, 311 (1980). Because this claim is recognized in the first instance by the administrative agency alone, the doctrine of exhaustion of remedies applies, and "judicial interpretation is withheld until the administrative process has run its course." *Id.*

The trial court's orders of March 31 and April 7, 1986, are vacated, and the matter is remanded for dismissal of the complaint.

EUBANK, P.J., and GRANT, J., concur.

---

**16.** 15 U.S.C. § 80b–1 *et seq.*

**17.** Although no private right of action arises under the Consumer Loan Act, Transamerica concedes that a borrower may raise a violation of the Act as an affirmative defense in an action initiated by Transamerica.