812 P.2d 1019

Olivia M. RASCON; Jorge G. and Antonio G. Medina, Husband and Wife, Individually and on Behalf of All Others Similarly Situated, Plaintiffs–Appellants, Cross–Appellees,

v.

TRANSAMERICA FINANCIAL CORPORATION, a Delaware Corporation; Pacific Finance Loans dba Transamerica Financial Services, a California Corporation; Transamerica Financial Services, Inc., an Arizona Corporation, Defendants–Appellees, Cross–Appellants.

BENEFICIAL ARIZONA, INC., formerly known as Beneficial Finance Co. Arizona, a Delaware Corporation; Beneficial Mortgage Co. of Arizona, a Delaware Corporation; and Southwest Beneficial Finance, Inc., an Illinois Corporation, Petitioners,

v.

SUPERIOR COURT OF the State of Arizona, In and For the COUNTY OF MARICOPA, Honorable Alan S. Kamin, a Judge Thereof, Respondent Judge,

Leonard H. AROS and Connie Aros, Husband and Wife; Ronald E. Wade and Belle Wade, Husband and Wife; Arturo Espinoza and Odine Espinoza, Husband and Wife; Johnnie Breckenridge and Jeanne Breckenridge, Husband and Wife; James E. Clark and Suzanne Clark, Husband and Wife; James L. Williams and Vicki L. Williams, Husband and Wife; John E. Berry and Theresia Berry, Husband and Wife; Individually and on Behalf of Others Similarly Situated, Real Parties in Interest.

Nos. 1 CA–CV 89–572, 1 CA–SA 89–263.

Court of Appeals of Arizona, Division 1, Department B.

Nov. 23, 1990.

Review Denied June 25, 1991.*

* Feldman, V.C.J., of the Supreme Court, recused himself and did not participate in the determination of this matter.

**202**

Meyer, Hendricks, Victor, Osborn & Maledon by William J. Maledon, Andrew D. Hurwitz and Mark A. Fuller, Phoenix, Southern Arizona Legal Aid, Inc. by William E. Morris and Salese McCarthy, P.C. by Armand Salese, Tucson, for plaintiffs-appellants, cross-appellees and respondents.

Streich, Lang, Weeks & Cardon by Wm. S. Hawgood II, Louis A. Stahl, Charles W. Jirauch and Randall S. Theisen, Phoenix, for defendants-appellees, cross-appellants.

Molloy, Jones & Donahue, P.C. by Michael J. Meehan and Mark Dinell and Slutes, Sakrison, Even, Grant & Pelander, P.C. by John Pelander, Tucson, for petitioners.

O'Dowd, Burke & Lundquist by Bruce A. Burke, Tucson, for real parties in interest.

## OPINION

JACOBSON, Presiding Judge.

This appeal and petition for special action involve similar issues relating to the legality of certain lending practices instituted in 1980 by various consumer lenders in response to changes in Arizona's usury law. The sole issue we address is whether Consumer Loan Act licensees could make consumer loans, between July 1980 and July 1984, at rates permitted by the general usury statute. Because we hold that such loans were permissible, we affirm in CV 89–572 and accept jurisdiction and grant relief in SA 89–263.[1]

### HISTORICAL PERSPECTIVE [2]

Statutes controlling the amount of interest lenders may charge (usury statutes) have been in effect in Arizona since before statehood. Prior to 1980, these statutes regulated the interest rate that a lender could charge on a loan or other indebtedness by defining a specific maximum percentage rate. This rate has been changed by the legislature over the years to reflect fluctuations in the prevailing market interest rate. Special Project, *Usury and the Monetary Control Act of 1980*, 1981 Ariz. St.L.J. 27, 122–27 ("Special Project").

Similarly, the Small Loan Act (Act) has been in effect in Arizona since shortly after statehood. Special Project at 128. The dual purpose of the Act was (1) to protect borrowers of small amounts from the abuses and unconscionable charges prevalent in the small loan market, and (2) to authorize certain lenders to lawfully charge a small borrower an interest rate exceeding the legal rate set by the general usury statutes. *Transamerica Fin. Corp. v. Superior Court (Rascon)*, 155 Ariz. 327, 335, 746 P.2d 497, 505 (App.1987), *overruled on other grounds*, 158 Ariz. 115, 761 P.2d 1019 (1988). To these ends, the Act made it unlawful for an *unlicensed* lender to charge interest on a small loan in excess of the maximum allowed by law, that is, the general usury rate then in effect. Therefore, in order to lawfully charge the higher rates permitted under the Act, a lender was required to obtain a license. *See, e.g.*, Laws 1919, ch. 91, § 1; Rev.Code 1928, ch. 45, § 1989. In 1956, the legislature recodified this scope provision as A.R.S. § 6–602(A).[3]

---

1. Because of our disposition of these cases on this issue, we need not reach any other issue raised by the parties.

2. For a detailed discussion of the historical background behind this litigation, *see Transamerica Fin. Corp. v. Superior Court (Rascon)*, 155 Ariz. 327, 746 P.2d 497 (App.1987), *overruled on other grounds*, 158 Ariz. 115, 761 P.2d 1019 (1988).

3. As codified in 1956, A.R.S. § 6–602(A) provided:

   No person shall engage in the business of lending in amounts of six hundred dollars or less and contract for, exact or receive, directly or indirectly, or in connection with any such loan, any charges, whether for interest, compensation, consideration or expenses, which in the aggregate are greater than the interest

In 1979, rapidly rising interest rates on a national level caused concern that lenders would stop investing in Arizona and begin seeking higher rates of return elsewhere because Arizona statutorily limited maximum rates for all lenders. In response to this financial crisis, the Arizona legislature in December 1979 raised the general usury limit to 18%. Act of Dec. 14, 1979, 2d Spec.Sess., ch. 2, § 9, 1980 Ariz. Sess. Laws 1080–81. However, the national prime interest rate quickly exceeded 18%, rising to 20% in the spring of 1980. Special Project at 149. Again faced with a diminishing supply of money, the legislature amended the general usury statute in April 1980 to remove the rate ceiling, allowing any interest rate to be charged as long as the parties agreed in writing to such rate. Act of Apr. 23, 1980, ch. 200, § 9, 1980 Ariz. Sess. Laws 567–79; codified at A.R.S. § 44–1201(A).

At the same time, the legislature enacted the Consumer Loan Act (CLA), an updated version of the earlier Small Loan Act. The legislature substantially increased the maximum size of the loans subject to CLA provisions from $2,500 to $10,000, and amended without substantive change the scope provision of § 6–602(A). Act of Apr. 26, 1980, ch. 252, 1980 Ariz. Sess. Laws 1012–18. The legislature also retained the rate and penalty provisions of the earlier Act, including the traditional forfeiture penalty for violation of the rate restrictions. *See* A.R.S. §§ 6–622 and 6–628.

In 1984, the legislature significantly amended the CLA and its scope provision to expressly require that all consumer loans be made only by licensed lenders. Laws 1984, ch. 238, § 5. As previously indicated, this litigation involves the enforceability of thousands of loans made by CLA licensees between the 1980 removal of the interest rate ceiling and the 1984 requirement that all consumer lenders be licensed.

## FACTS AND PROCEDURAL HISTORY [4]

### a. *Rascon v. Transamerica*

Appellees Transamerica Financial Services, Inc., (Transamerica Financial) and Pacific Finance Loans (Pacific Finance) are both subsidiaries of appellee Transamerica Financial Corporation (Transamerica Corporation).[5] Transamerica Financial is a licensed lender under the CLA; Pacific Finance is not. Between 1980 and 1984, Pacific Finance made consumer loans in amounts between $2,500 and $10,000 to appellants Olivia M. Rascon and approximately 2,600 others (Rascon) at rates that exceeded those rates allowed by the CLA.

In 1985, Rascon brought the present class action suit against Transamerica, alleging that Pacific Finance was the alter ego of Transamerica Financial, and that the loans made by Pacific Finance between 1980 and 1984 therefore should be deemed as having been made by a CLA licensee. Because those loans violated the statutory rate restrictions placed on CLA licensees, Rascon alleged, the class was entitled, pursuant to A.R.S. § 6–628, to be excused from further payments and to receive a refund of all principal, interest, and loan charges paid.

Shortly after the trial court certified the class, Transamerica moved to dismiss on the basis that Rascon had no implied private right of action under the CLA. The trial court denied this motion, and Transamerica sought special action relief in this court. In July 1987, this court vacated the trial court's order denying Transamerica's motion to dismiss and ordered the matter

that the lender would be permitted by law to charge for a loan of money if he were not a licensee under this article, except as provided by this article, and without first having obtained a license from the superintendent. Any person not exempt under subsection B of this section who advertises for, solicits, or holds himself out as willing to make or procure loans in the amount or value of six hundred dollars or less shall be presumed to be engaged in the business described in this subsection.

4. We view the facts in the light most favorable to appellants Rascon and respondents Aros. *Anson v. American Motors Corp.*, 155 Ariz. 420, 421, 747 P.2d 581, 582 (App.1987).

5. Appellees will be referred to collectively as "Transamerica" unless the context otherwise requires.

remanded for dismissal of Rascon's complaint. *Transamerica*, 155 Ariz. at 340, 746 P.2d at 510. Our holding was later vacated by the Arizona Supreme Court, which held that Rascon was entitled to litigate her claim for relief under § 6–628. *Transamerica*, 158 Ariz. at 118, 761 P.2d at 1022.

After remand to the trial court, Transamerica filed the motion to dismiss that is the subject of this appeal. For the purpose of this motion, Rascon's alter ego allegations were accepted as true, and the loans at issue were deemed made directly by the licensed lender, Transamerica Financial. Given this premise, Transamerica moved to dismiss on the basis that A.R.S. § 6–602(A), as it existed between 1980 and 1984, permitted licensed lenders to make consumer loans at rates agreed to in writing under the general usury statute.

The trial court granted Transamerica's motion to dismiss and Rascon appealed.

b. *Beneficial Arizona v. Aros*

Although this case reaches us in a different procedural posture, the underlying factual scenario of this special action is virtually identical to that of the Transamerica case described above.

Petitioners Beneficial Arizona, Inc. (Beneficial Arizona), Southwest Beneficial, Inc. (Southwest Beneficial), and Beneficial Mortgage Company of Arizona (Beneficial Mortgage) are subsidiaries of Beneficial Corporation. Beneficial Arizona and Southwest Beneficial are licensed lenders under the CLA; Beneficial Mortgage is not. Between 1980 and 1984, Beneficial Mortgage made consumer loans in amounts between $2,500 and $10,000 to respondents Leonard H. Aros and approximately 750 others (Aros) at rates exceeding those allowed by the CLA.

In 1986, Aros brought the class action suit at issue against Beneficial Arizona, Southwest Arizona, and Beneficial Mort-

gage (collectively, Beneficial), alleging that Beneficial Mortgage was the alter ego of Beneficial Arizona, and that the consumer loans made by Beneficial Mortgage between 1980 and 1984 should be deemed made by a CLA licensee. As does Rascon, Aros asserted that, because those loans violated the rate restrictions of the CLA, the class was entitled to be excused from further payment and to receive a refund of all principal, interest, and loan charges paid, pursuant to A.R.S. § 6–628.

Beneficial moved to dismiss the complaint for failure to state a claim. For purposes of its motion, Beneficial assumed the truth of the alter ego allegations, thereby admitting that the loans at issue were made by a licensed lender. Nevertheless, it argued, Aros' complaint should be dismissed because A.R.S. § 6–602(A), as it existed from 1980 to 1984, permitted licensees to charge any interest rate or other charges on consumer loans to which the borrower agreed in writing.

The trial court denied Beneficial's motion, and Beneficial petitioned this court for special action.[6]

## DISCUSSION

At all times pertinent to this litigation, A.R.S. § 6–602(A) of the CLA provided:

It is unlawful for a person to engage in the business of lending in amounts of ten thousand dollars or less and contract for, exact or receive, directly or indirectly, or in connection with any such loan, any charges, whether for interest, compensation, consideration or expenses, which in the aggregate are greater than the interest that the lender would be permitted by law to charge for a loan of money if he were not a licensee under this article, except as provided by this article, and without first having obtained a license from the superintendent....

Both sides of this litigation contend that the language of § 6–602(A) is plain and

---

6. The trial court denied Beneficial's motion to dismiss in December 1986. The case then became dormant during the two year period in which the *Transamerica* private right of action issue was on appeal. After the supreme court

held that a private right of action existed under the CLA, and after a ruling on a motion by Beneficial not relevant to this opinion, Beneficial filed this petition for special action.

compels us to reach a decision supporting their respective interpretations of the statute. Transamerica and Beneficial (collectively, lenders) argue that, under the plain language of § 6–602(A), CLA licensees were not subject to CLA rate provisions, even on consumer loans under $10,000, provided that the loans were lawful under the general usury statute. Conversely, Rascon and Aros (collectively, consumers) argue that § 6–602(A) on its face sets up a dual classification pursuant to which unlicensed lenders were free to charge up to what was permitted by the general usury statute, while licensees were bound by the CLA rate restrictions.

Statutory language is the primary and most reliable evidence of legislative intent. *State ex rel. Corbin v. Pickrell*, 136 Ariz. 589, 592, 667 P.2d 1304, 1307 (1983). Moreover, absent a clearly expressed legislative intent to the contrary, statutory language, if plain, is controlling. *Id.; Collins v. Stockwell*, 137 Ariz. 416, 420, 671 P.2d 394, 398 (1983). However, in our opinion, the language of § 6–602(A) is far from plain. Not only do the parties dispute the meaning of § 6–602(A), but the two trial court decisions before us embraced contrary interpretations as well. We do not believe that § 6–602(A), on its face, unambiguously supports either of the parties' positions; moreover, we find it difficult to believe that the parties themselves seriously contend that it does. We turn then to the legislative history behind this statute in order to interpret its meaning. *See Dupnik v. MacDougall*, 136 Ariz. 39, 42, 664 P.2d 189, 192 (1983) (court may look to historical background of statute to shed light on its meaning and intent).

As discussed above, small loan laws made funds available to small borrowers by allowing licensed lenders to charge higher rates than those allowed under the general usury law. In fact, the Arizona Supreme Court recognized that the one privilege granted to licensed lenders was an ability to lend small amounts of money at an interest rate greater than would otherwise be allowed by law. *Transamerica*, 158 Ariz. at 116–17, 761 P.2d at 1020–21. Prior to 1980, the rate provisions of Arizona's small loan laws clearly established special preferential rate limits above those set by the general usury statute. Even in 1979, when the legislature raised the usury limit to an all-time high of 18%, licensees remained entitled to charge even higher rates.

However, in early 1980, when the prevailing market interest rate rose above the 18% limit then set forth in § 44–1201, the legislature removed set usury limits altogether. After April 23, 1980, A.R.S. § 44–1201(A) provided:

> Interest on any loan, indebtedness, judgment or other obligation shall be at the rate of ten per cent per annum, unless a different rate is contracted for in writing, *in which event any rate of interest may be agreed to.*

(Emphasis added.)

At the same time it enacted § 44–1201(A), the legislature also adopted the CLA, including § 6–602(A). In its original form, § 6–622 of the CLA would have provided that a licensee could "receive on a small loan a rate as set by contract." S.B. 1352, § 3, 34th Legis., 2d Reg.Sess. (1980). As introduced, § 6–622 would have in effect removed interest rate restrictions on consumer loans made by licensees. However, the House deleted this provision by what is commonly known as the McConnell Amendment, and, as finally enacted, § 6–622 provided a sliding rate scale applicable to licensed lenders. Arizona House of Representatives Floor Amendment Sheet to S.B. 1352 (Apr. 16, 1980) McConnell Amendment.

It was not until 1984 that the CLA was amended to specifically require that all consumer loans be made by licensed lenders. Between 1980 and 1984, therefore, it is clear that *unlicensed* lenders were permitted to make consumer loans at any rate agreed to in writing under § 44–1201(A) at a time when prevailing market rates were generally higher than the rates set forth in § 6–622. Special Project at 155. Whether this so-called "loophole" was intended by the legislature is not the issue before us. Rather, what concerns us in this litigation

is whether a second "loophole" had also been created by the legislature through which *licensed* lenders also were permitted to make consumer loans at any rate of interest agreed to in writing, even if such rate exceeded the rates set forth in § 6–622.

The lenders emphasize that they, along with all lenders generally, had always been allowed to make loans, including consumer loans, at rates "permitted by law," that is, at rates permitted under the general usury statute. A license was required only if rates were charged in excess of those "permitted by law." Thus, the lenders argue, it would be nonsensical to propose that the legislature, during a financial crisis, would suddenly grant all other lenders freedom to charge any rate they desired and at the same time deprive consumer lenders of their historic preferential status to charge higher interest rates and also prohibit them from charging rates "permitted by law."

We agree. Historically, small loan laws were intended to restrict rates chargeable *above usury limits,* not to regulate lending within the limits "permitted by law." F. Hubachek, *Annotations on Small Loan Laws* 175–76 (1938). Consequently, the scope provisions of Arizona's small loan laws always applied to lending at rates exceeding those permitted under the general usury statute. At no time has the legislature manifested an intent to restrict consumer loan licensees to rates below those "permitted by law."

Nevertheless, the consumers argue that the legislature in 1980 in fact intended to do just that. They contend that § 6–602(A) defines unlawful conduct only for unlicensed lenders and does not even address what constitutes lawful conduct for licensees. According to the consumers, once a lender becomes a "licensee," it is bound by all of the provisions of the CLA, including

the interest rate provisions of § 6–622, regardless of the current market rate or the rates permitted by § 44–1201(A). In support of this contention, the consumers point to the McConnell Amendment, which, they argue, reflects the legislature's intent not to deregulate licensees.

As stated above, the McConnell Amendment undoubtedly deleted a proposed version of § 6–622 that would have explicitly deregulated interest rates on all consumer loans. We agree with the consumers that this deletion evidences the legislature's intent not to permanently deregulate consumer lending. However, we also believe, as the lenders argue, that the legislature *did* intend for licensees to benefit from the revised usury law while the market rates were high. Thus, retention of the rate structure of § 6–622 allowed these rates to be in place in the event that rate ceilings in § 44–1201 were later reimposed or the prevailing market rate fell below those rates set in § 6–622.[7]

Thus, contrary to the consumers' contention, the CLA (and specifically § 6–622) is not rendered superfluous under an interpretation of § 6–602(A) allowing licensees to make consumer loans at rates exceeding CLA limits.[8] Moreover, the § 6–622 rate structure continued to apply, even during 1980 through 1984, to any pre–1980 CLA loans which by contract provided for subsequent rate increases up to the maximum lawful rate. Laws 1980, ch. 200, § 18. In addition, licensed lenders continued to be subject to banking department supervision during this period pursuant to §§ 6–604.01 and 6–605.01, even with regard to loans made by them pursuant to § 44–1201(A). Finally, as the lenders point out, because § 44–1201(A) distinguished between loans at rates contracted for in writing (with no maximum rate) and those at rates not agreed to in writing (with a 10% maximum

7. Theoretically, under § 44–1201(A), a lender can receive *any* rate agreed to in writing, bound only by the limits of A.R.S. § 13–2302, which prohibits extortionate extension of credit. However, the "amount agreed to in writing" pursuant to § 44–1201(A) is effectively controlled by the money market and tied to the prevailing prime interest rate.

8. In fact, the consumers' interpretation of § 6–602(A) as applying only to prohibit conduct by unlicensed lenders effectively renders § 6–602(A) superfluous because the conduct of unlicensed lenders is governed by the general usury statute, regardless of § 6–602(A).

rate), § 6–622 continued to apply between 1980 and 1984 to any consumer loan at a rate higher than 10% that was not agreed to in writing by the borrower.[9]

As noted previously, small loan laws also benefit consumers by making more money available to them and, at the same time, protecting them from unconscionable lending practices. In order to achieve this benefit, we believe that § 6–602(A) must be interpreted along with the CLA as a whole to give licensed lenders the right to charge the higher of either the general usury limit or the rate provisions of § 6–622. Under a contrary interpretation, licensed lenders would have three alternatives: (1) give up their licenses in order to make unregulated loans at the higher market rates; (2) retain their licenses and make unprofitable loans at CLA rates; or (3) retain their licenses and make no loans to small borrowers. We believe that it is ludicrous to assume licensed lenders would choose to make unprofitable loans.[10] Therefore, under an interpretation of § 6–602(A) as urged by the consumers, small borrowers would ultimately be faced with a dwindling supply of money in an unregulated market, defeating the principal benefit to consumers of small loan laws.

## CONCLUSION

We hold that, between 1980 and 1984, § 6–602(A) authorized licensed lenders to make consumer loans at rates permitted under § 44–1201(A). Therefore, we affirm the judgment of the trial court in CV 89–572. We accept jurisdiction and grant relief in SA 89–263, and remand for proceedings consistent with this opinion. We grant Beneficial's request for attorneys' fees pursuant to A.R.S. § 12–341.01, upon compliance with Rule 21, Arizona Rules of Civil Appellate Procedure. We make no determination as to fees in the Trans-

america appeal, no request for such having been made by Transamerica.

GRANT, C.J., and LANKFORD, J., concur.

---

9. *See* Laws 1984, ch. 238, § 10 (amended by Laws 1987, ch. 210, § 5) (requiring agreement in writing).

10. *But see* A.R.S. § 6–615(C) (failure of licensee to operate business of lending under CLA for any continuous period of 60 days or more constitutes ground for revocation of license).