825 P.2d 1

PERINI LAND AND DEVELOPMENT COMPANY, a Delaware corporation, Douglas C. Kennedy, a married man, filing individually, Plaintiffs/Appellants,

v.

PIMA COUNTY, a body politic of the State of Arizona, Greg Lunn, Reg Morrison, Daniel Eckstrom, Raul Grijalva and Ed Moore in their capacities as Members of the Pima County Board of Supervisors; Jane S. Williams in her capacity as Clerk of the Pima County Board of Supervisors; Larry Bahill in his capacity as the Director of Elections for Pima County; and Michael Boyd in his capacity as Recorder for Pima County, Defendants,

and

Sabino Canyon Coalition, Inc., an Arizona nonprofit corporation, Defendant/Intervenor/Appellee.

No. CV–91–0300–AP.

Supreme Court of Arizona.

Jan. 7, 1992.

Motion for Reconsideration and Supplemental Motion for Reconsideration Denied March 3, 1992.

Lewis and Roca by S.L. Schorr, Janet Napolitano, Lynne A. Collins, John P. Frank and Julie C. Tolleson, Tucson, for plaintiffs/appellants.

Stephen D. Neely, Pima County Atty. by Christopher L. Straub, Deputy County Atty., Tucson, for defendants.

David P. Tiers, Tucson, for defendant/intervenor/appellee.

## OPINION

RUTH V. McGREGOR, Court of Appeals Judge.

Plaintiff Perini Land and Development Company (Perini) appeals from the trial court's order directing the Pima County Board of Supervisors to place a referendum proposed by intervenor Sabino Canyon Coalition, Inc. (the Coalition) on the ballot in the next Pima County election. Perini also challenges the trial court's order enjoining Perini's development plans near Sabino Canyon, Arizona. We hold the Coalition's referendum petition did not strictly comply with constitutional requirements and therefore reverse the judgment of the trial court.

## I.

In 1989, Perini filed an application with the Pima County Planning and Zoning Commission to rezone 410 acres of land near Sabino Canyon for development. The Pima County Board of Supervisors approved the application and, on October 11, 1990, signed the rezoning ordinance. On that same date, the Coalition filed an application for a referendum number with the Pima County Division of Elections (the County). Larry Bahill, the Pima County Director of Elections, accepted the application and told the Coalition it needed 17,167 valid signatures to refer the rezoning ordinance to the voters. That number represents ten percent of the votes cast in Pima County for governor in the 1986 general election. *See* Ariz. Const. art. 4, pt. 1, § 1(7).

On November 9, 1990, the Coalition filed its petition with the County. The County issued a receipt indicating the Coalition had filed 25,142 signatures with the petition. The County then randomly sampled the validity of the signatures, pursuant to A.R.S. § 19-121.02. Because the number

of valid signatures projected from the random sample did not equal or exceed one hundred five percent of the minimum number of signatures required, the County ordered the county recorder to examine and verify each signature. *See* A.R.S. § 19-121.04(C). After the county recorder verified individual signatures, the County certified 20,000 signatures.[1]

The County determined, however, that the Coalition needed 20,148 signatures, or ten percent of the votes cast in Pima County in the November 6, 1990, gubernatorial election, to place the referendum on the ballot. Because the Coalition had obtained too few valid signatures, the County refused to place the referendum on the ballot.

The Coalition filed suit seeking an order placing the referendum on the ballot and enjoining Perini's development plans. The Coalition urged that the County should have used the votes cast in the 1986, rather than the 1990, general election to calculate the minimum number of signatures needed. The trial court consolidated the Coalition's action with an earlier action filed by Perini, in which Perini contended the County had failed to disqualify several thousand invalid signatures.

The trial court agreed with the Coalition; found the Coalition filed more than 17,167 but less than 20,148 valid signatures; ordered the referendum placed on the ballot; and enjoined Perini's development plans.

After hearing oral argument, we reversed the trial court's judgment, directed that the court not place the referendum on the ballot, and stated that a written opinion would follow. This is that opinion.

## II.

■ The first issue, on which we requested the parties to file supplemental briefs, is whether this appeal could have been properly filed in the court of appeals.

The question arises from the interaction between two statutes. The first relevant

---

1. At trial, the County conceded the validity of an additional 65 signatures, for a total of 20,065 signatures.

statute, A.R.S. § 19–122(C), which predates establishment of the Arizona Court of Appeals, permits either party in a referendum action to appeal to this court. A second statute, A.R.S. § 12–120.21(A)(1), confers jurisdiction over such cases upon the court of appeals.

In *Arizona Podiatry Ass'n v. Director of Ins.*, 101 Ariz. 544, 422 P.2d 108 (1966), we addressed a similar situation. As we observed in that decision, the legislature enacted more than 40 statutes providing for appeals to this court prior to establishment of the court of appeals. *Id.* at 547, 422 P.2d at 111. Although the legislature defined the court of appeals' appellate jurisdiction broadly enough to encompass most areas over which this court has jurisdiction, *see* A.R.S. § 12–120.21, the legislature did not repeal existing statutes permitting appeals directly to this court. In light of the broad appellate jurisdiction vested in the court of appeals, we concluded, "[i]t is inconceivable that the legislature meant to preclude the [court of appeals'] ... jurisdiction by its failure to repeal those statutes [conferring jurisdiction upon the supreme court]." *Id.* We held that neither court maintained exclusive jurisdiction in such instances:

> It has long been a general rule of law that a grant of jurisdiction to one court does not, in the absence of an express provision to that effect, imply that the jurisdiction is to be exclusively vested in that court.

*Id.* at 549, 422 P.2d at 113. After considering the pending workload of this court, however, we reaffirmed our policy of transferring those cases over which the courts exercise concurrent jurisdiction to the court of appeals. *Id.*

■ The same analysis applies here, and we reach the same conclusion. Although we have concurrent jurisdiction with the court of appeals over referenda appeals, a party should file any future action challenging a decision in a referendum case in the court of appeals. Because of the pending workload of this court and our desire to promote orderly judicial administration, we will transfer to the court of appeals referenda cases over which the courts exercise concurrent jurisdiction.

■ Although the parties agree the court of appeals could exercise jurisdiction over this appeal, they assert the normal appellate procedure could result in a party's inability to obtain full review of a referendum dispute before an upcoming election. Consequently, they urge us to develop new procedures to expedite appeals in referenda cases. We decline to do so. Existing procedures provide avenues for obtaining expedited consideration of any appeal under appropriate circumstances. If the time remaining until the next general election is too short to permit the usual appeals procedure to run its course, a party can request expedited consideration from the court of appeals. Rules 3, 6, Ariz. R.Civ.App.P. In addition, any party to an appeal can petition this court to transfer an action from the court of appeals to it. Rule 19(c), Ariz.R.Civ.App.P. We believe these existing procedures provide sufficient protection to parties who require expedited consideration of an appeal.

### III.

■ The central issue before us is whether the trial court applied the correct measure to determine whether the Coalition submitted a sufficient number of valid signatures in support of its referendum petition.[2]

The Arizona Constitution, through the referendum process, reserves to qualified electors the power to refer to voters legislation enacted by elected representatives. Ariz. Const. art. 4, pt. 1, § 1(3). The constitution expressly defines the requirements with which referendum proponents must comply. *See id.* § 1(4), (7), (8), and (9). In *Western Devcor, Inc. v. Massie*, 168 Ariz. 426, 814 P.2d 767 (1991), we recently considered the extraordinary power of the ref-

---

**2.** Because our conclusion on this issue is dispositive, we do not reach Perini's alternative argu- ments.

erendum and reaffirmed the distinction between the standard of compliance with constitutional provisions required in initiative cases and referendum cases:

We permit substantial compliance in the initiative context, ... but require strict compliance in the referendum context.... Because the referendum is an "extraordinary" power ... that permits a "minority to hold up the effective date of legislation which may well represent the wishes of the majority," we require referendum proponents to comply strictly with applicable constitutional and statutory provisions.

*Id.* at 428–29, 814 P.2d at 769–70 (citations omitted). *See also Cottonwood Dev. v. Foothills Area Coalition of Tucson, Inc.,* 134 Ariz. 46, 49, 653 P.2d 694, 697 (1982); *Direct Sellers Ass'n v. McBrayer,* 109 Ariz. 3, 5, 503 P.2d 951, 953 (1972).

The requirement central to this dispute involves the method for determining the number of valid signatures required to place a referendum on the ballot. The constitution permits "ten percentum of the [qualified] electors [to] propose the Referendum on legislation enacted within and by [a] city, town, or county." Ariz. Const. art. 4, pt. 1, § 1(8). The constitution also defines the basis for calculating the number of "qualified electors":

The whole number of votes cast for all candidates for Governor at the *general election last preceding the filing of any Initiative or Referendum petition* on a State or county measure shall be the basis on which the number of qualified electors required to sign such petition shall be computed.

*Id.* § 1(7) (emphasis added).

Perini argues the plain language of this constitutional provision requires that the number of signatures needed to refer a measure to the voters be determined by reference to the number who voted in Pima County in the last general election held prior to the filing of the *completed petition.* The Coalition contends, and the trial court held, that the constitution's reference to "the general election last preceding the filing of any ... Referendum petition" ac-

tually refers to the general election last preceding the filing of the *application* for the referendum petition. If Perini is correct, the votes cast in the 1990 general election determine the number of signatures required. If the Coalition is correct, the number of votes cast in the 1986 general election is determinative.

The meaning of this constitutional provision presents a question of law that this court reviews *de novo. See Western Devcor,* 168 Ariz. 426, 814 P.2d 767 (1991). We look first to the language of the provision, for if the constitutional language is clear, judicial construction is neither required nor proper. *Pinetop–Lakeside Sanitary Dist. v. Ferguson,* 129 Ariz. 300, 302, 630 P.2d 1032, 1034 (1981).

The constitutional provision at issue unambiguously states that the basis for determining the number of required signatures is the number of votes cast in the general election *last preceding* the filing of the completed referendum petition. The constitution's clear language permits no exception when, as occurred in this instance, a general election falls between the date a party applies for and the date a party files a referendum petition. We therefore conclude the Coalition could comply with the constitution only by submitting valid signatures equal to ten percent of the votes cast in Pima County in the 1990 election, which was the general election last preceding the filing of the Coalition's petition.

■ The Coalition asserts, however, that requiring strict compliance with the constitution's unambiguous language in this instance leads to an absurd result. If enforcing the clear language of the constitution results in an absurd situation, the court may look behind the bare words of the provision to discern its intended effect. *Ward v. Stevens,* 86 Ariz. 222, 228–29, 344 P.2d 491, 495 (1959). We will consider a constitutional provision absurd "if it is so irrational, unnatural, or inconvenient that it cannot be supposed to have been within the intention of [persons] with ordinary intelligence and discretion." *Bussanich v. Douglas,* 152 Ariz. 447, 450, 733 P.2d 644, 647 (App.1986).

**384**

The Coalition contends the constitutional language leads to an absurd result because, when an election intervenes between the dates of applying for and filing a referendum petition, its proponents will not know the number of signatures required when they circulate their petition. That factual situation can occur, as it did here. The alternative, however, would be to allow referendum proponents to rely upon outdated election results to determine the number of signatures required even though current election results are available. Use of outdated results could permit reliance upon a number that is far less than ten percent of the votes cast in the intervening election, particularly if the number of eligible voters has increased between elections. Persons of ordinary intelligence and discretion could well conclude that some uncertainty as to the number of signatures required is preferable to permitting a disproportionately small number of electors to delay the wishes of the majority.

The Coalition also argues that, because the constitution mandates that legislative sessions commence on the second Monday in January, *see* Ariz. Const. art. 4, pt. 2, § 3, the framers undoubtedly assumed the sessions would conclude early enough to allow referendum proponents sufficient time to circulate and file petitions before the next general election.[3] The provision in question, however, applies not only to legislation enacted by the state but also to legislation enacted by counties. The framers had no discernible reason to anticipate that a county would not enact legislation near the date of a general election.

We find the language of the provision in question unambiguous and find the Coalition's argument that a strict interpretation will lead to absurd results unpersuasive. The Coalition's arguments reduce to the assertion that referendum proponents are handicapped when the exact number of signatures required cannot be known while petitions are being circulated. The possibility that an intervening election may make referendum proponents' task more

difficult does not provide a sufficient basis to excuse a failure to comply strictly with constitutional requirements. As we pointed out in *Western Devcor,* "[i]f our state constitution contains provisions considered too inconvenient for present-day operation, the remedy is to amend it—not to ignore it." 168 Ariz. at 432, 814 P.2d at 773.

### IV.

For the foregoing reasons, we reverse the decision of the trial court.

GORDON, Jr., C.J., and CAMERON, MOELLER, and CORCORAN, JJ., concur. Justice STANLEY G. FELDMAN did not participate in this decision. Pursuant to article 6, § 3 of the Arizona Constitution, Judge RUTH V. McGREGOR of the Court of Appeals, Division One, was designated to sit in his stead.

---

**3.** Referendum proponents must file their completed petitions within 30 days after enactment of the county ordinance to be referred. *See*

A.R.S. §§ 19–142(A) and 19–144; *Pioneer Trust Co. v. Pima County,* 168 Ariz. 61, 68, 811 P.2d 22, 29 (1991).