925 P.2d 1359

**HOMEBUILDERS ASSOCIATION OF CENTRAL ARIZONA, an Arizona nonprofit corporation; Robert Solem; and Mark Solem, Plaintiffs–Appellees,**

**v.**

**CITY OF SCOTTSDALE, a municipal corporation; Sonia Robertson, in her official capacity as City Clerk, Defendants–Appellees,**

**and**

**Scottsdale Concerned Citizens, Inc., Intervenor–Appellant.**

**NEW MEXICO AND ARIZONA LAND COMPANY, an Arizona corporation; and Suzanne Drake, Petitioners,**

**v.**

**SUPERIOR COURT of the State of Arizona, In and For the COUNTY OF MARICOPA, the Honorable Steven D. Sheldon, a judge thereof, Respondent Judge,**

**Helen PURCELL, in her official capacity as Maricopa County Recorder; City of Scottsdale, a municipal corporation; and Sonia Robertson, in her official capacity as City Clerk of the City of Scottsdale, Arizona; POPULAR (Property Owners Protesting Undeveloped Land Area Rezoning), an Arizona Association, Real Parties in Interest.**

**Nos. 1 CA–CV 95–0486, 1 CA–SA 96–0019.**

Court of Appeals of Arizona, Division 1, Department A.

Feb. 15, 1996.

As Modified March 7, 1996.

---

* Retired Judge Melvyn T. Shelley was authorized to participate in this appeal by order of the Chief Justice of the Arizona Supreme Court pursuant to Ariz. Const. art. 6, section 20 and A.R.S. § 38–813 (1985).

Beus, Gilbert & Morrill, P.L.L.C. by Paul E. Gilbert, Jeffrey D. Gross, John T. Moshier, Phoenix, for Plaintiffs–Appellees and Petitioners.

Burch & Cracciolo, P.A. by Andrew Abraham, Brent J. Welker, Phoenix, for Defendants–Appellees.

Siegel, Bellovin & Karnas by M. David Karanas, Michael H. Carter, Michael D. Richter, Tucson, for Intervenor–Appellant.

Maricopa County Attorney, Division of County Counsel by Christina P. Sargeant, Deputy County Attorney, Phoenix, for Real Party In Interest Helen Purcell.

City Attorney's Office, City of Scottsdale by Amy L. Lieberman, Fredda J. Bisman, Scottsdale, for Real Parties in Interest City of Scottsdale and Sonia Robertson.

POPULAR by Hannah Goldstein, Chairman, Marlene Baker, Treasurer, Scottsdale, Real Party In Interest pro se.

## OPINION

CONTRERAS, Presiding Judge.

Intervenor–Appellant Scottsdale Concerned Citizens, Inc. (SCCI) appeals from the trial court's order granting summary judgment in favor of Appellee City of Scottsdale (city). The trial court ruled that SCCI's referendum petition did not contain the required number of signatures to be eligible for the city ballot scheduled for February 20, 1996, under a calculation based on the number of voters in a February 1994 city council election. Petitioners New Mexico and Arizona Land Company and Suzanne Drake (collectively petitioner) seek special action review of a contrary trial court ruling, in another case, that Real Party in Interest Property Owners Protesting Underdeveloped Land Area Rezoning (POPULAR) had an adequate number of signatures on its referendum petition to be eligible for inclusion on the February 20 ballot, under a calculation based on the number of voters in a March 1994 city election.

The issue in both cases is whether the February 1994 or the March 1994 Scottsdale city election should be used as the basis of calculating the number of signatures required for a referendum to be eligible for the city ballot.[1] This question involves the statutory interpretation of the word "councilmen" as either singular or plural in meaning, pursuant to Ariz.Rev.Stat.Ann. (A.R.S.) section 19–142(A), construed with the referenda and

initiative provisions of the Arizona Constitution. These are issues of law, for this court to review *de novo*. *See Weekly v. City of Mesa*, 181 Ariz. 159, 163, 888 P.2d 1346, 1350 (App.1994) (statutory construction); *Perini Land & Dev. Co. v. Pima County*, 170 Ariz. 380, 383, 825 P.2d 1, 4 (1992) (interpretation of constitution). For that reason, this court, ·on its own motion, consolidated the two cases for judicial economy and an early disposition. *See* Rule 8(b), Arizona Rules of Civil Appellate Procedure. Additionally, the appeal was accelerated pursuant to A.R.S. section 19–122(C) and we accepted special action jurisdiction because of the statewide importance of this issue and the necessity of reaching a prompt resolution. *See City of Flagstaff v. Mangum*, 164 Ariz. 395, 397, 793 P.2d 548, 550 (1990) (relief by appeal inadequate if it would result in delay beyond scheduled election).

We conclude that, pursuant to A.R.S. section 19–142(A), the word "councilmen" includes the singular; thus, the March 1994 city election is the basis for calculating the number of signatures necessary for these referendum petitions. Based on this conclusion, we reverse the trial court's decision in the *Homebuilders* case and deny special action relief in the *New Mexico and Arizona Land Company* case. We conclude that, based on the otherwise uncontested rulings of both trial courts, both referendum petitions contained an adequate number of signatures to place the referenda on the February 20, 1996, city ballot. This court entered an order to that effect on February 13, 1996, with this opinion to follow.

## FACTUAL AND PROCEDURAL BACKGROUND

A. *Homebuilders Association v. City of Scottsdale*

On October 4, 1994, the city enacted Ordinance No. 2710, making certain zoning

---

1. As discussed more fully *infra*, based on the February 1994 election, at which two councilmen were elected, 2478 petition signatures would be required in each of these cases. However, based on the March 1994 election, at which only one councilman was elected, only 612 referendum petition signatures would be required. Thus, resolution of this issue determines whether both petitions are eligible for inclusion on the February 20, 1996, city ballot.

changes[2] that affected land owned by plaintiffs-appellees (collectively, Homebuilders). On October 10, 1994, SCCI applied for a referendum petition to refer the ordinance to the voters, and was informed by the city clerk at that time that 612 signatures were needed to constitute the required ten percent of qualified electors who voted at the last election for a councilman, in March 1994. On November 4, SCCI returned the petitions with approximately 1200 signatures, and the city clerk determined that the referendum petition was adequate.

In December 1994, Homebuilders filed a civil action in superior court against the city, seeking to have the referendum petition declared invalid, on the basis that the minimum number of signatures should be computed from the number of voters in the February 1994 election, at which two councilmen were elected, based on the use of the plural term "councilmen" in A.R.S. section 19-142(A). Under that computation, the petition would be required to have a minimum of 2478 signatures rather than the 612 computed from the March 1994 election, at which only one councilman was elected. SCCI was allowed to intervene, and Homebuilders moved for summary judgment.

After hearing arguments, Judge Michael B. Dann ruled as follows:

The statutory language involved, 19-142(A), referring to referendum petitions is clear. It doesn't need any interpretation or gloss supplied by me, at least the language election ["]at which a mayor or councilmen were chosen preceding the submission,["] et cetera.

If I were to interpret it the way the defendants and intervenors suggest [in the singular], I think it would require me to amend the, to ignore, change that language.

And given the difference between the two processes, these two political processes, both of which are important and fundamental and so forth, it makes sense the difference between 142 and 143, 143 the latter, speaking in the singular, mayor or councilman. And given the case law that

requires strict compliance with the referendum requirements and because there are no factual issues here—the issue is strictly legal, one for the court—I grant the plaintiffs' motion [for] partial summary judgment, deny the cross-motions for summary judgment by the defendants and intervenors.

In his formal written order, Judge Dann ruled that the referendum petition filed by SCCI did not have the requisite number of signatures, based on the number of voters in the February 1994 election, and ordered the city to reject the petition and exclude the referendum from the ballot. SCCI timely appealed.

B. *New Mexico and Arizona Land Company v. Superior Court*

On April 4, 1995, the city enacted Ordinance No. 2759. POPULAR submitted a referendum petition, and was told by the city that the requisite number of signatures was either 612 or 2478, depending on the outcome of the *Homebuilders* suit. The city found that, if the number of signatures was determined to be based on the March 1994 city election, POPULAR's referendum could be validly included on the ballot. The city scheduled the election for February 20, 1996.

Petitioners filed a special action in superior court to invalidate the referendum petition, arguing, in relevant part, that 2478 signatures were required, based on the February 1994 election. On petitioner's motion for summary judgment, and after oral argument, Judge Steven D. Sheldon issued a lengthy ruling, concluding that the number of qualified electors who must sign the referendum petition is governed by the March 1994 election:

The statutory language in A.R.S. § 19-142(A) is clear. The ten percent requirement is to apply to the election, "at which a mayor or councilmen were chosen *last* preceding the submission of the application for a referendum petition...." While plaintiff argues the use of the plural "councilmen" demonstrates a legislative intent to look to an election where more than one

---

**2.** The substance of the zoning changes is not relevant to the issues on appeal.

"councilman" is elected, such an argument must be rejected when A.R.S. § 1–214 and § 9–821.01 are read together. The latter section permits the procedure adopted by the City of Scottsdale which has been set out in its city code. . . .

The language of A.R.S. § 19–142(A) is clear and unambiguous. The argument that the use of the term "councilmen" excludes calculations based on the March election is unpersuasive. A.R.S. § 1–214 requires that when statutes are interpreted that the singular may mean the plural and plural may mean singular depending upon the context. . . . Therefore, this Court has concluded that the necessary number of signatures must be determined by the number of electors at the March election. That number is 612. The petition submitted by POPULAR has, at the very least, over 800 valid signatures to support it.

Thus, Judge Sheldon denied petitioner's motion for summary judgment, and petitioner brought a special action to this court from that order.

## DISCUSSION

The Arizona Constitution provides for submission to the voters of state referenda and initiative measures through the following provisions:

(1) . . . [T]he people reserve the power to propose laws and amendments to the Constitution and to enact or reject such laws and amendments at the polls, independently of the Legislature; and they also reserve, for use at their own option, the power to approve or reject at the polls any Act, or item, section, or part of any Act, of the Legislature.

(2) **[Initiative Power]** The first of these reserved powers is the Initiative. Under this power *ten percentum of the qualified electors* shall have the right to propose any measure. . . .

(3) **[Referendum power . . . ]** The second of these reserved powers is the Referendum. Under this power the Legislature,

or *five percentum of the qualified electors,* may order the submission to the people at the polls of any measure. . . .

Ariz. Const. Art. 4, Pt. 1, § 1 (emphasis added). For state elections, the number of "qualified electors" is calculated from the "whole number of votes cast for all candidates for Governor at the general election last preceding the filing of any Initiative or Referendum petition." Ariz. Const. Art. 4, Pt. 1, § 1(7).

For city elections, however, the constitution provides as follows:

. . . Under the power of the Initiative *fifteen per centum* of the qualified electors may propose measures on such local, city, town or county matters, and *ten per centum* of the electors may propose the Referendum on legislation enacted within and by such city, town, or county. Until provided by general law, said cities and towns may prescribe the basis on which said percentages shall be computed.

Ariz. Const. Art. 4, Pt. 1, § 1(8) (emphasis added).

Two principles can be discerned from these provisions. First, the drafters intended that more signatures be required to propose an initiative than a referendum; second, a higher percentage of "qualified electors" is necessary to place an initiative or referendum on a city ballot than on a state ballot.

By statute, the legislature provided for the submission of city referenda and initiative measures, but allowed cities to provide for requirements "which are less restrictive on the right to initiative and referendum." A.R.S. § 19–141(A). However, the legislature directed that the procedure followed by the cities "shall be as nearly as practicable the same as the procedure relating to initiative and referendum provided for the state at large." A.R.S. § 19–141(C). Beginning in 1912, and substantially unchanged since 1939,[3] the provision for calculating the required number of signatures for city referenda petitions has been as follows:

---

**3.** Our tracking of the amendments to A.R.S. section 19–142(A) since its enactment indicates that only one comma has been changed since 1939 prior to the amendments at issue in this case. *See* 1989 Ariz.Sess.Laws, ch. 10, § 5.

The whole number of votes cast at the city or town election at which a mayor or council*men were* chosen last preceding the filing of a referendum petition against an ordinance, franchise or resolution shall be the basis on which the number of electors of the city or town required to file a referendum petition shall be computed.

A.R.S. § 19–142(A) (emphasis added). Until 1991, the companion statutory provision regarding the filing of city initiative petitions did not contain a similar basis for calculation:

If an ordinance, charter or amendment to the charter of a city or town is proposed by initiative petition, it shall be filed with the city or town clerk, who shall submit it to the voters of the city or town at the next ensuing election held therein not less than ninety days after it was first presented to the city or town council....

Former A.R.S. § 19–143(A). Thus, no statute defined "qualified electors" for purposes of city initiative petitions.

The Attorney General opined in 1974 that, under this former provision, the required number of signatures for an initiative petition to be placed on a city ballot was fifteen percent of the registered voters qualified to vote in the last preceding municipal election. Op.Ariz.Atty.Gen. No. 74–5–L (1974). A subsequent opinion concluded that, because the legislature had failed to define "qualified electors" for purposes of city initiative petitions, the cities were free to choose a basis to compute the constitutional percentage of signatures required for initiative petitions. Op. Ariz.Atty.Gen. No. I 86–011 (1986). However, our supreme court later ruled that, because of this "void in the general law," and because the city charter in that case referred back to state law, a "gap-filler" could be found in the requirement in A.R.S. section 19–141(C) that local initiative procedures be as consistent as possible with state law. *City of Flagstaff v. Mangum,* 164 Ariz. 395, 401, 793 P.2d 548, 554 (1990). By looking to the state constitution, the court reasoned that, "in the absence of controlling local law to the contrary, the number of qualified electors required to sign a local initiative petition is fifteen percent of the entire vote cast for all candidates for mayor at the last proceeding general municipal election." *Id.* The *Mangum* court also noted that the legislature had considered, but did not enact, two bills in 1988 and 1989 that would "expressly adopt a formula analogous to the one set forth in the constitution." *Id.; see* S.B. 1249, 39th Legis., 1st Reg.Sess. (1989) (held in committee); H.B. 2236, 38th Legis., 2d Reg.Sess. (1988) (bill stricken). It is against this background that the current statutory provision regarding city initiative petitions, A.R.S. section 19–143(A), was enacted.

In 1991, the legislature approved Senate Bill 1001, which made the following amendments to these provisions: [4]

**§ 19–142. Referendum petitions against municipal actions ...**

A. The whole number of votes cast at the city or town election at which a mayor or councilmen were chosen last preceding the ~~filing of~~ *submission of the application for* a referendum petition against an ordinance, franchise or resolution shall be the basis on which the number of electors of the city or town required to file a referendum petition shall be computed.... [5]

**§ 19–143. Initiative petitions in cities ...**

*A. The whole number of votes cast at the city or town election at which a mayor or councilman was chosen last preceding the submission of the application for an initiative petition is the basis for computing the number of qualified electors of the city or town required to sign the petition unless the city or town by charter or ordinance provides an alternative basis for computing the number of necessary signatures.*

S.B. 1001, 1991 Ariz.Sess.Laws, Ch. 1, §§ 22, 23 (3d Spec.Sess.).

■ At issue in this case is whether A.R.S. section 19–142(A), by its uninterrupted use of

4. Additions to the existing statutory language are indicated by underline; deletions are indicated by strikeout. *See generally* 1991 Ariz.Legis.Serv. (40th Legis.3d Spec.Sess.) (West 1991).

5. No other changes were made to the remaining provisions of A.R.S. section 19–142.

the plural word "council*men*," requires the number of signatures on a city referendum petition to be computed from the last city election in which *more than one* council*man* was elected. Petitioners argue that, by the legislature's use of the singular term "council*man*" in the amended initiative provisions of A.R.S. section 19–143(A), the legislature has evidenced an intent to require a greater number of signatures for a referendum petition, because it retained the plural "council*men*" in A.R.S. section 19–142(A). Appellant argues, on the other hand, that no such legislative intent is evident in the history of these statutes, and that the general statutory principle that "words in the plural number include the singular" controls. *See* A.R.S. § 1–214(B). Thus, appellant argues, the use of the plural word "council*men*" in A.R.S. section 19–142(A) does not preclude a calculation based on the number of voters at the last election in which only one councilman was elected, regardless of the use of the singular "council*man*" used in amended A.R.S. section 19–143(A).

■ As a preliminary matter, we note that rules of statutory construction are unnecessary when the meaning of a statute can be discerned from the plain meaning of its language. *Janson v. Christensen*, 167 Ariz. 470, 471, 808 P.2d 1222, 1223 (1991). However, in this case, we reject the argument that the meaning of "councilmen" as either singular or plural is clear and unambiguous. Not only have the parties in these consolidated appeals presented considerable argument in two courts disputing the interpretation of this term, but two superior court judges have ruled differently on the meaning of this word in this context. Under these circumstances, we find an ambiguity sufficient for us to resort to general principles of statutory construction. *See, e.g., Rascon v. Transamerica Financial Corp.*, 168 Ariz. 201, 205, 812 P.2d 1019, 1023 (App.1990) (ambiguity in statute found where "two trial court decisions before us embraced contrary interpretations").

■ We also acknowledge that, in the area of referendum petitions, Arizona courts require strict compliance with all constitutional and statutory provisions, no matter how minor. Referendum petition compliance is more demanding than that required for initiatives for the following policy reasons:

Throughout the years, . . . we have recognized Arizona's strong public policy favoring the initiative and referendum. . . . In cases challenging compliance with constitutional and statutory requirements, however, we have distinguished between these two forms of participation in the legislative process. We permit substantial compliance in the initiative context, . . . but require strict compliance in the referendum context. . . .

We base this distinction on the difference between the two processes. An initiative allows qualified electors to submit legislation to the voters; a referendum allows qualified electors to refer to the voters legislation that has already been enacted by elected representatives. . . . Because the referendum is an "extraordinary" power, . . . that permits a "minority to hold up the effective date of legislation which may well represent the wishes of the majority," we require referendum proponents to comply strictly with applicable constitutional and statutory provisions. . . . Thus, while recognizing the historical importance of the referendum to our state, we have required strict compliance to ensure that the constitutional right is not abused or improperly expanded. . . . Accordingly, courts must closely examine referendum petitions to determine whether they comply with constitutional and statutory requirements.

*Western Devcor, Inc. v. City of Scottsdale*, 168 Ariz. 426, 428–29, 814 P.2d 767, 769–70 (1991) (citations omitted) (finding referendum petitions invalid for failure to comply with requirement that petition circulators did not indicate belief that each signer was a qualified elector); *see also Perini*, 170 Ariz. at 383, 825 P.2d at 4 (concluding that "last preceding" election means last election preceding filing of petition even if election falls after petition is applied for and signatures gathered); *Cottonwood Dev. v. Foothills Area Coalition*, 134 Ariz. 46, 50, 653 P.2d 694, 698 (1982) (petition that did not include copy of measure being referred was invalid); *Direct Sellers Ass'n v. McBrayer*, 109 Ariz.

3, 6, 503 P.2d 951, 954 (1972) (omission in affidavit that petition circulator was a qualified elector destroyed presumption of validity of petition). Nevertheless, these cases do not stand for the proposition that we must strictly construe the provisions of section 19–142(A). As we have recently pointed out, "[l]egislation relating to referendum petitions, however, may not unreasonably hinder or restrict the constitutional provision and must reasonably supplement the constitutional purpose." *Van Riper v. Threadgill,* 183 Ariz. 580, 581, 905 P.2d 589, 591 (App. 1995) (petitioning group's failure to file statement of organization and fact that signature sheets contained 10 rather than 15 signature lines did not invalidate petition). We therefore reject petitioner's argument that because referendum requirements must meet strict compliance they must be construed without reference to the general rules of statutory construction.

■ We also concur with the general principle that the legislature is presumed to mean what it says. *Padilla v. Industrial Comm'n,* 113 Ariz. 104, 106, 546 P.2d 1135, 1137 (1976); *see also State v. Johnson,* 171 Ariz. 39, 41, 827 P.2d 1134, 1136 (App.1992) (legislature is presumed to express itself in "as clear a manner as possible" and that "it accorded words their natural and obvious meanings unless stated otherwise"). However, we also presume that the legislature meant what it said when it enacted its own general rules of statutory construction. *See* A.R.S. §§ 1–211 to 1–215. We further presume the legislature was aware of those statutory rules of construction when it enacted A.R.S. section 19–142(A). *State v. Garza–Rodriguez,* 164 Ariz. 107, 111, 791 P.2d 633, 637 (1990).

■ The first rule of construction stated in our statutory scheme is that those rules "shall be observed in the construction of the laws of the state unless such construction would be inconsistent with the manifest intent of the legislature." A.R.S. § 1–211. In this case, those rules also include the statutory directive that words in the plural be interpreted to include the singular. A.R.S. § 1–214(B).

This general principle of statutory interpretation has been widely adopted in most statutory schemes. *See generally* 2A Norman J. Singer, *Sutherland Statutes and Statutory Construction,* § 47.34 at 273 (5th ed. 199s & cum. supp. Mar. 1995). The historical purpose of construing plural and singular nouns and verbs interchangeably is to avoid requiring the legislature to use such expressions as "person or persons," "he, she, or they," and "himself or themselves." Earl T. Crawford, *The Construction of Statutes* 374 (1940). Under this principle, the plural has often been held to apply to the singular in a statute, absent evidence of contrary legislative intent. *See, e.g., In re Marriage of Braje,* 85 Ill.App.3d 744, 41 Ill.Dec. 593, 407 N.E.2d 1091 (2d Dist.1980); *Kaeser v. Zoning Board of Appeals,* 218 Conn. 438, 589 A.2d 1229 (1991); *Secretary of State v. Bryson,* 244 Md. 418, 224 A.2d 277 (1966); *Levine v. Randolph Corp.,* 150 Conn. 232, 188 A.2d 59 (1963); *see also* Sutherland, *supra,* at 273 n. 2, and cases cited therein. Thus, in this case, unless we find a legislative "manifest intent" to the contrary, we will construe the plural noun "councilmen" to include the singular "councilman."

We have examined the sparse legislative history on the 1991 amendments to the initiative and referendum statutes to ascertain whether any "manifest intent" was indicated to require a different method of computing "qualified electors" in initiative petitions than in referendum petitions. *See State v. Takacs,* 169 Ariz. 392, 395, 819 P.2d 978, 981 (1991) (reviewing court may look to legislative history as some indication of legislative intent; may also look to policy behind statute and will read statutes relating to same subject in harmony). The committee meeting minutes in both the House and the Senate are silent with regard to the use of the plural or singular words used in these statutes; indeed, there is no indication that this question was ever noticed or considered in formulating the above amendments to A.R.S. sections 19–142(A) and –143(A). *See* Minutes of Committee on Judiciary, Arizona State Senate, November 1, 1991, November 4, 1991; Minutes of Judiciary Committee, Arizona House of Representatives, November 6,

1991.[6] Petitioner and appellees argue that the legislature "xeroxed" the language of section 19–142(A) when adding section 19–143(A), except for the singular/plural distinction. However, the entirely different grammatical structure of the addition of A.R.S. section 19–143(A), when compared to the long-established language of A.R.S. section 19–142(A), indicates that the former was enacted without comparison to or consideration of the other. For example, except for the opening clause of each provision, the remaining language is not parallel. Section 19–142(A) is worded "shall be the basis on which the number or electors of the city or town required to file a referendum petition shall be computed." Section 19–143(A) is worded "is the basis for computing the number of qualified electors of the city or town required to sign the petition unless the city or town by charter or ordinance provides an alternative basis for computing the number of necessary signatures." Because the two provisions use different verbiage throughout, we cannot conclude that the use of "councilmen" in one and "councilman" in the other, by itself, evidences a manifest intent to make a substantive difference between the two provisions in the type of election to which the provisions refer. We believe that, had the legislature intended such a result, it would have changed the existing term "councilmen" in section 19–142(A) to a more explicit requirement, such as the last election "at which more than one councilman was elected."

Additionally, as appellant points out, a construction that restricts "councilmen" to the plural in A.R.S. section 19–142(A) but allows "councilman" to remain singular in A.R.S. section 19–143(A) would have the result of requiring significantly more petition signatures for a referendum than for an initiative under the circumstances of this case.[7] Such a result is, of course, in conflict with the constitutional provision that more qualified electors must sign an initiative petition than a referendum petition, and with the statewide procedure of calculating the number of qualified electors for each type of petition from the same election, although requiring different percentages. *See* Ariz. Const. Art. 4, Pt. 1.

Furthermore, the general statutory scheme provides that a municipality may provide a less restrictive scheme for referendum and initiative than the state provides, A.R.S. section 19–141(A). Apparently, the city has done so by providing a procedure under which only one councilman may be elected in a general election. *See generally* A.R.S. § 9–821.01 ("a city ... may by ordinance provide that any candidate who receives a majority of all votes cast at such election shall be declared elected to the office for which he is a candidate, and no further election shall be held as to such candidate"). As Judge Sheldon noted in the *New Mexico and Arizona Land Company* case:

The City of Scottsdale, pursuant to its Code, held an election in February 1994. According to art. 9, sec. 5, of the [Scottsdale City] Code, any candidate who received, at the [February] election, a majority of all of the ballots cast was "elected" in that election and was not required to stand for election in the "general" or March election. There were two councilpersons elected outright in the "primary" election in February and a "general" election was then held in March 1994. *See, City of Scottsdale Code, art. 9, sec. 7.* The parties have inaccurately referred to the March

6. Appellees-petitioner argue that S.B. 1001 was a "comprehensive overhaul" of the statutory scheme relating to city referenda and initiatives. However, in the House Judiciary Committee, Senator Ann Day "explained that S.B. 1001 is a technical and procedural bill. She said it provides more information and is an attempt to clarify language to avoid litigation." Minutes, Nov. 6, 1991, at 8.

7. For example, basing an initiative petition on the March election, at which one "councilman" was elected, would require the signatures of only 900 voters, or 15% of the approximate 6000 who voted in that election. Basing a referendum petition on the February 1994 election, however, at which two "councilmen" were elected, would require the signatures of 2478 voters, or 10% of the approximate 24,000 who voted at that election. This result runs contrary to the general constitutional requirement and the state procedures that require only 10% of the "qualified electors" to submit a referendum petition, but 15% of the "qualified electors" for an initiative petition, when "qualified electors" are calculated for both measures from the same last preceding election.

election as a "run-off" election. According to the Scottsdale City Code and A.R.S. § 9–821.01, a city may do precisely what Scottsdale has elected to do in their local elections. That is, some councilpersons may be elected outright in what is referred to as a "primary" election and, if all vacant positions are not filled, then a "general" election is held.[8]

A municipality's referendum scheme must be as "nearly as practicable the same" as the procedure provided for the state, A.R.S. section 19–141(C). To construe the referendum statute to require more qualified electors for a referendum than for an initiative would be contrary to the constitutional provisions by which both the city and state procedures are governed, and contrary to existing state procedures. In this case, we believe that would be an absurd result that can be avoided by a sensible construction of the word "councilmen" in A.R.S. section 19–142(A) that makes it consistent with its related constitutional and statutory provisions. *See Perini,* 170 Ariz. at 383–84, 825 P.2d at 4–5 (court should not give a strict literal interpretation to a statutory word if it leads to an absurd result). We find no "manifest intent" in the legislature's enactment of A.R.S. section 19–143(A) with a singular noun and verb regarding initiatives that would indicate it intended to preclude the use of the singular in the long-established language of A.R.S. section 19–142(A) regarding referenda, or to compute "qualified electors" by different elections for purposes of referendum and initiative petitions.

If the result of this construction is that the city is now faced with numerous referendum petitions based on an unreasonably low number of signatures from qualified electors following a general election at which only a single councilman is elected, the city's remedy is to amend its city code, not distort the statutory requirements for initiating a referendum petition. Judge Sheldon aptly expressed this in his ruling:

The city has chosen to adopt an election procedure which, on occasion, may lend itself to a requirement of extremely low numbers of signatures on referenda petitions when a low voter turn-out occurs at a "general" election.

The societal costs of disgracefully low voter turnouts may, of course, be wide-ranging. Certainly, it has the effect of encouraging referenda on numerous issues which elected representatives have otherwise attempted to resolve, the cost to taxpayers in dollars can be extraordinary. The emotional unrest and anxiety to the community may be just as real, but more abstract. This concern, however, is no justification for the judiciary to attempt to enforce its own social policy when the language of the statute is clear. The electors and their elected government officials must meet the problem, if there is one, themselves.

... While it may appear unfortunate that 612 signatures could cause the expenditure of time, effort and money this issue has to the taxpayers, the extremely low voter turn-out and the election procedure which the city has adopted has facilitated such a result.

*See also Perini,* 170 Ariz. at 384, 825 P.2d at 5, quoting *Western Devcor,* 168 Ariz. at 432, 814 P.2d at 773 (if existing referendum procedure is "too inconvenient for present-day operation, the remedy is to amend it—not to ignore it").

Based on the foregoing, we construe the term "councilmen" in A.R.S. section 19–142(A) to include the singular term "councilman," pursuant to A.R.S. section 1–214(B). Therefore, the election "last preceding the filing of a referendum petition" in both these cases was the March 1994 general election at which only one councilman was elected. Based on the otherwise undisputed computations in the trial court in both these cases, under these circumstances, both referenda are eligible for inclusion on the city ballot on February 20, 1996.

8. Scottsdale's election procedure thus is factually distinguishable from that in the case on which petitioner/appellees rely in their reply brief. *See Sylva v. Board of Supervisors,* 208 Cal.App.3d

648, 256 Cal.Rptr. 138 (1st Dist.1989) (last "election" did not include primary election, at which candidates were merely nominated, not elected).

**652**

## CONCLUSION

We reverse the judgment in the civil appeal, and direct that the trial court enter an order allowing the referendum in *Homebuilders* to be eligible for inclusion the city ballot on February 20, 1996. We accept special action jurisdiction but deny relief in the *New Mexico and Arizona Land Company* special action.

Because no requests for attorneys' fees have been filed in the *Homebuilders* appeal, each party will bear its own fees on appeal. POPULAR has requested attorneys' fees pursuant to A.R.S. section "12–3401(C)," [9] and A.R.S. section 12–349. However, because POPULAR was not represented by legal counsel in this special action, we deny that request. *See Connor v. Cal–Az Properties, Inc.,* 137 Ariz. 53, 56, 668 P.2d 896, 899 (App.1983) (attorney-client relationship required for recovery of attorneys' fees).

On appeal the judgment is reversed and remanded. Regarding the special action, jurisdiction is accepted and relief denied.

WEISBERG and TOCI, JJ., concur.

---

9. Presumably, POPULAR meant to request fees pursuant to A.R.S. section 12–341.01(C).